# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **DALE E. HARPER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-11-996-HE** |
| | ) | |
| **WOODWARD COUNTY BOARD** | ) | |
| **OF COUNTY COMMISSIONERS et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Dale E. Harper, a state prisoner appearing pro se and proceeding *in forma pauperis*, brings this action under 42 U.S.C. § 1983, alleging violations of his federal constitutional rights. United States District Judge Joe Heaton has referred the matter to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b). This Report and Recommendation addresses pending dispositive motions filed by Defendants Woodward County Board of County Commissioners, Gary Stanley, Saunnie Thompson, Roger Routh, and Devan Brewer (Doc. Nos. 115, 116, 152).

### BACKGROUND AND STATUS OF ACTION

On February 10, 2012, Plaintiff filed an amended complaint in which he asserted some 24 claims against at least 30 defendants.[1] *See* Second Am. Compl., Doc. No. 50. Plaintiff's claims are largely, but not entirely, based on actions taken in connection with

---

[1] In this Report and Recommendation, the undersigned refers to Plaintiff's February 10, 2012, Complaint, as modified by a June 7, 2013, Order (Doc. No. 136), as his "Second Amended Complaint."

the arrest, detention, and prosecution of Plaintiff by state officials in Woodward County, Oklahoma, for violation of various Oklahoma criminal statutes.

On September 27, 2012, the Court dismissed with prejudice Plaintiff's claims against three groups of Defendants—state judges Don Work and Ray Dean Linder, state prosecutors Hollis Thorpe, Danny Lohman, A.J. Laubhan, and Don Brown, and state witness Otto Vines—due to the immunity of those Defendants from such claims. Order, Doc. No. 73, at 1-2, 4. Further, the Court dismissed without prejudice Plaintiff's claims against Defendants Joe Tate, Urgent Care, Edwina Smith, and an "unknown thief" for failure to state a claim upon which relief may be granted. *Id.* at 3-4.

Further, in accordance with the abstention doctrine set forth in *Younger v. Harris*, 401 U.S. 37 (1971), the Court stayed many of Plaintiff's remaining claims because they relate to ongoing criminal proceedings against Plaintiff in Woodward County.[2] *See* Order, Doc. No. 73, at 2-3, 4; *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982) (noting that under *Younger*, federal courts avoid "interference with pending state judicial proceedings absent extraordinary circumstances"). Specifically, the Court stayed Plaintiff's claims against Defendants Kevin Mitchell, T.

---

[2] Upon review of state court records for Woodward County, Oklahoma, the undersigned judicially notices that these criminal proceedings remain ongoing as of this date. According to the publicly available docket sheet in the relevant proceeding, Plaintiff's case is set for jury trial on October 6, 2014. *See State v. Harper*, No. CF-2009-198 (Woodward Cnty. Dist. Ct. filed June 30, 2009). This docket sheet is available at http://www1.odcr.com/detail?court=077-&casekey=077-CF++0900198. The docket sheet also reflects that issues with Plaintiff's competency to stand trial may have contributed to the delay in his case proceeding to trial.

Keith Wilson, Newell Wright, Cynthia Viol, Vicki Cook, Kim Crouch, Kenny Roberts, Mike Harper, Joe Adams, Troy White, and Deputy Cody until the conclusion of the Woodward County criminal proceedings. Order, Doc. No. 73, at 2-3, 4. The Court similarly stayed Plaintiff's claims against the Woodward County Board of County Commissioners ("Board of County Commissioners" or "the Board") and Woodward County Sheriff Gary Stanley that relate to Plaintiff's arrest and prosecution. Order, Doc. No. 73, at 3, 4. The following claims ("the active claims")are not subject to the stay: (1) Plaintiff's claims against Defendants Saunnie Thompson, Devan Brewer, and Roger Routh; and (2) Plaintiff's claims against Defendants Stanley and the Board of County Commissioners to the extent the claims are not related to Plaintiff's arrest or prosecution.[3] *See* Order, Doc. No. 73, at 5; Order, Doc. No. 185, at 1-2.

Plaintiff was granted leave to amend his current pleading to assert claims against four additional defendants: City of Woodward police officers Travis Munson, James Rea, Mike Morton, and Barrett Storm (the "City Defendants"). *See* Order, Doc. No. 129. Plaintiff in his Second Amended Complaint had named "John Doe[s] 1, 2, and 3" as defendants; he then subsequently identified Munson, Rea, Morton, and Storm as the referenced individuals. *See* Order, Doc. No. 129; Order, Doc. No. 136, at 2; Second Am.

---

[3] In Plaintiff's Second Amended Complaint, Defendant Devan Brewer's last name is misspelled as "Brewar." *See* Second Am. Compl. at 4; Def. Brewer's Mot. to Dismiss or Alt. Mot. Summ J., Doc. No. 152, at 7 n.1 (clarifying spelling).

Compl. at 4.[4]  Making provision for the mistake in number, the Court ordered the substitution of Defendants Munson, Rea, Morton, and Storm for John Does 1 to 4.  *See* Order, Doc. No. 136, at 2.  Because Plaintiff's claims against the City Defendants also relate to Plaintiff's ongoing Woodward County criminal proceedings, such claims were stayed in accordance with *Younger*.  *See* Order, Doc. No. 185, at 1-2.  In the interim, the City Defendants filed a dispositive motion (Doc. No. 149) that may be addressed independently of the stay of Plaintiff's claims against them.  As set forth in a concurrently issued report and recommendation, the undersigned recommends that these Defendants' motion be denied.

Defendants to the active claims have filed dispositive motions, which are addressed in this Report and Recommendation.  Specifically, Defendant Board of County Commissioners has moved to dismiss or, alternatively, for summary judgment (Doc. No. 115, "Disp. Mot. 1") and incorporated by reference the dispositive motion—also a motion to dismiss or in the alternative for summary judgment—filed by Defendants Stanley, Thompson, and Routh (Doc. No. 116, "Disp. Mot. 2").  Disp. Mot. 1 at 8.  The latter Defendants' filing in turn incorporated by reference Defendant Board of County Commissioner's dispositive motion.  Disp. Mot. 2 at 27.  Defendant Brewer, who was served slightly later in the proceedings, filed a motion to dismiss or in the alternative for summary judgment (Doc. No. 152, "Disp. Mot. 3") and has incorporated by reference the

---

[4] Citations to documents filed with the Court use the page numbers assigned by the Court's electronic filing system.

dispositive motions filed by the other Defendants. Disp. Mot. 3 at 18. A Special Report (Doc. No. 114, "S.R.") was also filed by Defendants in accordance with the Court's orders (Doc. Nos. 77, 105) and *Martinez* v. *Aaron*, 570 F.2d 317 (10th Cir. 1978). In their dispositive motions, Defendants Stanley, Thompson, Routh, Brewer, and the Board of County Commissioners have incorporated the Special Report by reference. Disp. Mot. 1 at 8; Disp. Mot. 2 at 27; Disp. Mot. 3 at 18.

Plaintiff has responded to Defendants' dispositive motions and has submitted evidentiary material in support of his claims. In responding to the dispositive motions of Defendants Board of County Commissioners, Stanley, Thompson, and Routh, Plaintiff filed two responses (Doc. No. 165, "Pl.'s Resp. to Disp. Mot. 1"; Doc. No. 164, "Pl.'s Resp. to Disp. Mot. 2") and one set of exhibits (Doc. Nos. 165-1 to 165-3).[5] Plaintiff also filed a response to Defendant Brewer's dispositive motion (Doc. No. 171, "Pl.'s Resp. to Disp. Mot. 3"). Defendants Board of County Commissioners, Stanley, Thompson, and Routh filed a joint reply (Doc. No. 168, "Cnty. Defs.' Reply"), which Defendant Brewer incorporated by reference in his own reply (Doc. No. 176). Finally, Plaintiff submitted two supplemental briefs (Doc. Nos. 174, 183) without obtaining leave of Court but that the undersigned has accepted and considered. *See* LCvR 7.1(i); Order, Doc. No. 218.

As set forth below, the undersigned recommends that these Defendants' dispositive motions be granted in part and denied in part.

---

[5] Although Plaintiff's exhibits were filed collectively, each citation to those exhibits in this Report and Recommendation is through an individual description of the document and specification of its location in the record.

ANALYSIS

As noted, Defendant Stanley is the Woodward County Sheriff. Second Am. Compl. at 2. Defendants Thompson, Routh, and Brewer are or were employees of the Woodward County Jail ("WCJ"), in which Plaintiff was detained after his June 29, 2009 arrest. *See* Second Am. Compl. at 4. These Defendants broadly assert—with little attention to or effort to distinguish between the varying standards of review—that Plaintiff has failed to state a claim upon which relief may be granted, that alternatively summary judgment should be entered in their favor, and that as government employees they are entitled to qualified immunity in their individual capacities. *See* Disp. Mot. 2 at 27-46; Disp. Mot. 3 at 18-29. Defendant Board of County Commissioners has likewise moved that the claims against it be dismissed or, alternatively, that summary judgment be granted in its favor. *See* Disp. Mot. 1.

A. *Standards of Review and Matters Considered*

1. <u>Motion to Dismiss</u>

Although the Court construes a pro se litigant's pleadings liberally, no litigant is exempt from compliance with or the consequences of applicable procedural rules. *See Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007). Such rules require a plaintiff's complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint fails to state such a claim when it lacks factual allegations sufficient "to raise a right to relief above the speculative level on the assumption that all

the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citation and footnote omitted). Bare legal conclusions in a complaint, however, are not assumed to be true; legal conclusions "must be supported by factual allegations" to state a claim upon which relief may be granted. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

"[A] pro se plaintiff requires no special legal training to recount the facts surrounding his alleged injury, and he must provide such facts if the court is to determine whether he makes out a claim on which relief can be granted." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991); *see also Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (noting that although courts construe pro se pleadings liberally, courts "will not supply additional factual allegations to round out a plaintiff's complaint"). Whether a complaint contains sufficient facts to avoid dismissal is context-specific and is determined through a court's application of "judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *see also Gee v. Pacheco*, 627 F.3d 1178, 1184-85 (10th Cir. 2010) (discussing *Iqbal*).

### 2. Motion for Summary Judgment

Summary judgment is a means of testing in advance of trial whether the available evidence would permit a reasonable jury to find in favor of the party asserting a claim. After considering the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party, the court is required to grant summary judgment when "'there is no genuine [dispute] as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting

Fed. R. Civ. P. 56(a)). Parties may establish the existence or nonexistence of a material disputed fact through:

- citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in the record; or

- demonstration "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(A)-(B).

The court does not, however, "weigh the evidence and determine the truth of the matter" but instead "determine[s] whether there is a genuine issue for trial"—i.e., whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The party moving for summary judgment bears the burden of showing that the undisputed material facts require judgment as a matter of law in that party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Finally, although summary judgment may be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," such judgment is typically entered only after adequate time for discovery. *See id.* at 322; *cf. Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); Fed. R. Civ. P. 56(d), (e).

3. <u>Independent Obligation to Screen Plaintiff's Complaint</u>

In addition to considering the contentions set forth in Defendants' dispositive motions, the undersigned is also required to evaluate the sufficiency of any complaint

brought by a prisoner (1) with respect to prison conditions; (2) seeking redress against a governmental entity, officer, or employee; or (3) who is proceeding *in forma pauperis*. *See* 42 U.S.C. § 1997e(c)(1); 28 U.S.C. §§ 1915A(a), 1915(e)(2)(B). Specifically, the Court is required to dismiss a complaint or any portion of a complaint that is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. *See* 42 U.S.C. § 1997e(c)(1); 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b). The standard of review for such screening is the same as that applied when considering a motion to dismiss for failure to state a claim. *See Kay*, 500 F.3d at 1218.

    4. <u>Matters Considered</u>

    Although Plaintiff's Second Amended Complaint is organized into multiple counts, the factual allegations and claims set forth therein often overlap among these counts. Accordingly, in the analysis that follows, the undersigned has primarily considered Plaintiff's claims based on the type of violation alleged, rather than adhering to the pleading's format. Further, because Plaintiff has not specified whether he is suing Defendants in their individual or official capacities, or both, the undersigned has considered both possibilities when appropriate. *See Houston v. Reich*, 932 F.2d 883, 885 (10th Cir. 1991) (instructing that, when not clearly indicated on complaint, court may determine capacity in which defendant is sued by reviewing course of proceedings).

    When analyzing whether the allegations in Plaintiff's Second Amended Complaint are sufficient to state a claim, the undersigned has not considered any matters presented beyond the pleadings. As to certain claims, however, Defendants have presented

arguments that exclusively rely on matters beyond the pleadings. When considering these arguments, the undersigned has treated Defendants' dispositive motions as seeking summary judgment as to the pertinent claims and has considered matters presented beyond the pleadings by both Defendants and Plaintiff. *See* Fed. R. Civ. P. 12(d). Finally, Defendants' dispositive motions as they pertain to Defendants Stanley and the Board have been considered only to the extent that the active claims against them are implicated.

## B. *Substantive Requirements for Claims Under 42 U.S.C. § 1983*

To succeed on a claim under 42 U.S.C. § 1983, a plaintiff must show *both*: (1) a violation of a right secured by the Constitution or laws of the United States, and (2) that the violation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). It is not sufficient to establish only that a federal right was violated.

### 1. Official Capacity Claims Under § 1983

If a defendant is sued under § 1983 in his or her official capacity, the suit is generally treated as one against the governmental entity that the defendant represents. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). Here, as detailed below, the relevant entity is a county, thereby implicating municipal liability. To establish municipal liability under § 1983, a plaintiff must first identify an official policy or custom of the municipality, whether enacted or maintained by its legislative body or an authorized decisionmaker. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769-70 (10th Cir. 2013). "A challenged practice may be deemed an official policy or

custom for § 1983 municipal-liability purposes if it is a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision." *Id.* at 770.

After identifying such an official policy or custom, the plaintiff must then establish that the policy or custom either (1) directly violated a federal right of the plaintiff, or (2) was the "moving force" behind a county employee's violation of a federal right of the plaintiff.[6] *Id.* Finally, a plaintiff must "show that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Id.* at 769, 770-71. Thus, for each claim of municipal liability, the plaintiff must establish three elements: (1) official policy or custom, (2) causation, and (3) requisite state of mind. *Id.* at 769.

### 2. Individual Capacity Claims Under § 1983

When a defendant is sued in his or her individual capacity under § 1983, the plaintiff must establish specific elements as to each defendant. First, the plaintiff must establish the defendant's "personal involvement or participation" in the alleged violation of a federal right. *Grimsley v. MacKay*, 93 F.3d 676, 679 (10th Cir. 1996); *see also Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976). Second, the plaintiff must establish a causal connection between the acts of that particular defendant and the alleged

---

[6] Because a municipality cannot be vicariously liable under § 1983 for the acts of an employee, "rigorous standards of culpability and causation must be applied" when "a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so." *Bd. of Cnty. Comm'rs of Bryan Cnty., v. Brown*, 520 U.S. 397, 405 (1997).

violation of a federal right. *See Iqbal*, 556 U.S. at 676; *Pahls v. Thomas*, 718 F.3d 1210, 1225-28 (10th Cir. 2013). Finally, the plaintiff must establish that the defendant acted with the state of mind required for the alleged underlying federal rights violation. *See Daniels v. Williams*, 474 U.S. 327, 330 (1986).

The above requirements also apply when a supervisor is alleged to be responsible for the misconduct of a subordinate. *See Schneider*, 717 F.3d at 767 (holding that § 1983 claim against supervisor cannot be premised on vicarious liability); *Iqbal*, 556 U.S. at 676-77; *see also Dodds v. Richardson*, 614 F.3d 1185, 1199 n.8 (10th Cir. 2010) (noting that elements of liability may overlap). To establish the supervisor's personal involvement, a plaintiff must show that the supervisor's own individual actions violated a federal right of the plaintiff, for example through the supervisor's specific direction of a subordinate employee's action or through the supervisor's promulgation, creation, implementation, or responsibility for the continuation of a policy that resulted in the violation. *See Iqbal*, 556 U.S. at 676-77; *Dodds*, 614 F.3d at 1194, 1199; *Schneider*, 717 F.3d at 767-68; *Pahls*, 718 F.3d at 1225, 1226 (requiring plaintiff to "identify the specific polic[y] over which [a] particular [supervisor] possessed responsibility and that led to the alleged constitutional violation"). In this regard, it is not sufficient "merely to show [that the supervisor] was in charge of other state actors who actually committed the violation." *Dodds*, 614 F.3d at 1195 (internal quotation marks omitted). To establish causation—i.e., that a supervisor caused a violation of the plaintiff's federal rights—the plaintiff must establish that a subordinate of the supervisor violated the plaintiff's federal rights and that the supervisor "set in motion a series of events that the [supervisor] knew or reasonably

should have known would cause" such a violation. *See Schneider*, 717 F.3d at 768 (internal quotation marks omitted); *see also Dodds*, 614 F.3d at 1195-96, 1198. Finally, to establish state of mind the plaintiff must show that the supervisor acted with certain requisite intent, the exact nature of which depends on the type of violation alleged but is no less than the state of mind required for the subordinate to commit the underlying violation. *See Schneider*, 717 F.3d at 769; *Daniels*, 474 U.S. at 330; *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010); *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014).

3. <u>Qualified Immunity from Individual-Capacity Claims</u>

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This doctrine is intended "to shield officials from harassment, distraction, and liability when they perform their duties reasonably," while ensuring that such officials who "exercise power irresponsibly" are held accountable. *Id.*

Defendants Stanley, Thompson, Routh, and Brewer generally assert that, as government employees, they are entitled to qualified immunity in their individual capacities because either (1) Plaintiff has not sufficiently alleged a particular element of a violation of his federal rights; (2) under the undisputed facts, Plaintiff cannot establish such a violation; or (3) "it would not be clear to a reasonable officer in these Defendants' positions in making the same . . . decisions based on the facts as these officers knew

them, that any of the actions or decisions were violating Plaintiff's rights with regard to the undisputed facts herein." *See* Disp. Mot. 2, Doc. No. 116, at 45-46; *see also* Disp. Mot. 3, Doc. No. 152, at 29.

Although Defendants Stanley, Thompson, Routh, and Brewer assert this defense broadly, the applicability of such a defense requires a distinct evidentiary analysis and results in different consequences when asserted in the context of a motion to dismiss versus a motion for summary judgment. When qualified immunity is asserted in the context of a motion to dismiss, the factual allegations of the complaint are assumed to be true, and the court's analysis generally aligns with the analysis applied when determining the sufficiency of a claim. *See Brown v. Montoya*, 662 F.3d 1152, 1162-64 (10th Cir. 2011); *Iqbal*, 556 U.S. at 666, 673-75, 677-84. A defendant who has properly raised the defense of qualified immunity in a motion to dismiss is generally entitled to avoid broad discovery until his or her defense has been ruled upon. *See Mitchell*, 472 U.S. at 526; *Iqbal*, 556 U.S. at 684-86. Here, in light of the asserted individual-capacity defense of qualified immunity, discovery in this matter has been stayed at Defendants' request, despite Plaintiff's objections. *See* Order, Doc. No. 131; Pl.'s Objections, Doc. No. 141.

If a claim survives a motion to dismiss after qualified immunity has been raised, the plaintiff is often entitled to proceed with at least limited discovery. *See Iqbal*, 556 U.S. at 672, 684-86; *Lewis v. City of Ft. Collins*, 903 F.2d 752, 754 (10th Cir. 1990). Such discovery generally occurs before the plaintiff is required to defend against a motion for summary judgment. *See Celotex Corp.*, 477 U.S. at 322; *Mitchell*, 472 U.S. at 526. When qualified immunity is asserted in the context of a motion for summary

judgment, evidence beyond the allegations in the complaint is considered, and the standard detailed above for summary judgment is applied. *See Iqbal*, 556 U.S. at 673-74 (distinguishing between qualified immunity analyses).

Under either standard, the court analyzes a defendant's entitlement to qualified immunity through a two-pronged inquiry in which either prong may be considered first. *See Tolan*, 134 S. Ct. at 1866; *Pearson*, 555 U.S. at 236; *Brown*, 662 F.3d at 1164. To overcome this defense, the plaintiff bears the burden of establishing that the defendant violated the plaintiff's clearly established federal right. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002). In this regard, the court considers (1) "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right"; and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (citations omitted). However, "[w]hen the record shows an unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be properly denied." *Olsen*, 312 F.3d at 1312 (internal quotation marks omitted).

### C. Whether Plaintiff's Claims Against the Board of County Commissioners Should Be Dismissed as a Matter of Law

Defendant Board asserts that it is not a proper party to this lawsuit as a matter of law. Disp. Mot. 1, Doc. No. 115, at 8-14. In the alternative, Defendant Board asserts that Plaintiff has failed to state a claim for municipal liability against the Board or against members of the Board in their official capacities. *See id.* at 14-15.

Defendant Board of County Commissioners argues that under Oklahoma law it cannot be a proper party to this lawsuit or any lawsuit under § 1983 because the Board "does not exercise any final policy-making authority with regard to the operation of the Woodward County Jail." *See* Disp. Mot. 1 at 8-9. In support, Defendant Board cites Oklahoma statutes in which responsibility for a county jail is vested in the county's sheriff. *Id.* at 9 (citing Okla. Stat. tit. 19, §§ 513, 547).

While it is true that in appropriate circumstances a board of county commissioners may be dismissed from a § 1983 lawsuit because its policies or customs cannot be shown to be responsible for an alleged constitutional violation, that does not mean that such board can never be a proper party as a matter of law. Determining a party's responsibility for a policy that leads to a federal rights violation involves a fact-specific inquiry, as reflected in the cases cited by Defendant Board. For instance, although a county's sheriff has "charge and custody of the jail of his county," *see* Okla. Stat. tit. 19, § 513, the county's board of commissioners sets policies, including fiscal policies, that may be implicated in a violation of a county inmate's federal rights. *See id.* § 746 (assigning liability to county for certain county inmate medical expenses); *id.* tit. 57, §§ 41 (requiring county through board and at county expense to "have a jail or access to a jail . . . for the safekeeping of prisoners lawfully committed"), 51 (permitting board of county commissioners to appoint and pay salary of medical officer for county jail); *Edelen v. Bd. of Comm'rs of Bryan Cnty.*, 266 P.3d 660, 665-67 (Okla. Civ. App. 2011) (reconciling and distinguishing cases assigning liability between boards and sheriffs for prisoner medical care-related claims). Further, under Oklahoma law, a county is a suable

entity that is sued through its board of county commissioners. *See* Okla. Stat. tit. 19, § 4; *see also* Fed. R. Civ. P. 17(b)(3).

Defendant Board's motion overstates the law and lacks any meaningful analysis of the allegations against it. Accordingly, the undersigned recommends that Defendant Board's motion be denied to the extent that it seeks dismissal on the ground that it is not a proper party to this lawsuit as a matter of law.[7]

### D. Whether Plaintiff Has Stated or Supported a Claim of Deliberate Indifference to Serious Medical Needs (Counts I, V, VII, XX)[8]

#### 1. Factual Allegations in Second Amended Complaint

In his Second Amended Complaint, Plaintiff alleges that, before his arrest on June 29, 2009, he "had a pulled muscle in [his] upper back, and couldn't use [his] left arm that well." Second Am. Compl. at 8. He alleges that during his arrest, he was "tackled from behind," "bent backwards" while lying on his stomach, and "repeatedly kneed" by an

---

[7] Plaintiff names the Board of County Commissioners as a defendant but does not name specific members of the Board. *See* Second Am. Compl. at 1. Whether a complaint against a board of county commissioners is construed as asserting a claim against the entity itself or against the members of the board in their official capacities, the result is the same: the claim is effectively a claim against the county. *See Moore v. Bd. of Cnty. Comm'rs of Cnty. of Leavenworth*, 507 F.3d 1257, 1258 (10th Cir. 2007). In this Report and Recommendation, the undersigned analyzes Plaintiff's claims against the Board together with Plaintiff's official-capacity claims against other Woodward County employees, because all such claims are construed as against Woodward County. Plaintiff has not specifically asserted any claims against the members of the Board in their individual capacities and, regardless, does not allege acts by the individual board members from which one could reasonably infer their liability under § 1983. *See Pahls*, 718 F.3d at 1225-26, 1228; Second Am. Compl. at 1, 7 (referring only to "policies" of the Board as a whole, including "unwritten policies").

[8] Counts I, VII, and XX in the Second Amended Complaint contain allegations beyond those addressed in this section and are discussed elsewhere.

arresting officer, causing his back to be "broken" or "severely injured." *Id.* at 7, 8. As detailed below, Plaintiff generally asserts that medical care for this injury was improperly delayed and then, when provided, was inadequate.

More specifically, in Count V of his Second Amended Complaint, Plaintiff alleges that Defendant Thompson violated his Fourteenth Amendment right to due process "when she refused [him] medical care," although he had "show[n] her the bruises, thrice"—bruises that allegedly covered his "entire lower back."[9] *See id.* at 8, 21. Plaintiff states that the day after his arrest, he told Defendant Thompson that he "needed to see a doctor" because his "back hurt real, real bad." *See id.* at 8.[10] Plaintiff then asserts, "I never saw a doctor." *Id.* Plaintiff further states,

> [Defendant Thompson] said if I could get someone to make an appointment for me at a doctor, I could go. I had a friend make an appointment at Nielsens Chiropractic, for 11-23-09 at 10AM[.] I was not allowed to go for security reasons, nor was it rescheduled to [a]void the security issues. After I threw my food on the ceiling and got another charge, Judge Work ordered that I be taken to a doctor. I was then taken across the street to see the Quack Physician[] [A]ssistant at Urgent Care.

---

[9] Plaintiff also alleges in this Count and others that his Fourteenth Amendment right to equal protection was violated. These claims are addressed in a separate section below.

[10] Plaintiff states that this event occurred on "6-30-99." Second Am. Compl. at 8. However, in the context of the subsequent discussion regarding this claim and from the fact that Plaintiff was arrested on June 29, 2009, it appears that his reference to the year 1999 rather than 2009 was made in error. *See id.* at 7, 8.

*Id.*; *see also id.* at 2 (contending Defendant Thompson canceled the chiropractic appointment and "refused to allow[] the Plaintiff '*any*' medical care, even if he paid for it"); Second Am. Compl. Exs., Doc. No. 50-1, at 25.[11]

In Count VII, Plaintiff describes events involving a later visit to Urgent Care. Plaintiff alleges that on March 15, 2010, Defendant Brewer told Plaintiff that Plaintiff would be taken to the emergency room the next morning for x-rays. Second Am. Compl. at 9. Plaintiff then alleges that the next day, after Defendant Brewer told him to get dressed for a visit to the emergency room, Defendant Brewer announced that there had "been a change of plans" and that they were "goin[g] to Urgent Care instead." *Id.* Defendant Brewer asked Plaintiff if he still wanted to go, and, not wanting to "refuse medical care," Plaintiff consented. *See id.* Plaintiff states that, instead of ordering x-rays, "Edwina Smith, the Physician[] [A]ssistant at Urgent Care" performed an examination of Plaintiff by raising his right leg and then told Plaintiff that "there was nothin[g] wrong with [him]."[12] *Id.* Plaintiff alleges that he then raised and lowered his

---

[11] The cited exhibit is a letter dated November 5, 2010, from Dusty Nielsen, D.C., at Nielsen Chiropractic Center in Woodward, Oklahoma, stating that Plaintiff had an appointment scheduled at that office for November 23, 2009. Second Am. Compl. Exs. at 25. The letter further states, "When [Plaintiff] did not show, we called and were told the Sheriff's office did not have anyone to bring him in and they would call to reschedule him." *Id.* The letter then notes that the appointment was never rescheduled. *Id.*

[12] This claim incorporates factual allegations from Counts VI and VII, the former of which was previously dismissed by the Court. *See* Order, Doc. No. 73, at 4 (dismissing claims against Defendant Smith). Further, although not considered for or pertinent to the undersigned's sufficiency-of-the-claim analysis, later filings reflect that Ms. Smith is a nurse practitioner—not a physician assistant—and that Ms. Smith's first name is correctly spelled "Edwinna." *See* Edwinna Smith Aff., S.R. Ex. 8, Doc. No. 114-8.

left leg himself, causing his back to "pop" audibly.  *Id.*  An altercation ensued, which is addressed separately below, and, ultimately, Plaintiff left Urgent Care without receiving treatment.  *See id.* at 9-10.  At some point between this March 2010 visit to Urgent Care and May 2010, Plaintiff was transferred to an Oklahoma Department of Corrections ("ODOC") facility—Lexington Assessment and Reception Center ("LARC") in Lexington, Oklahoma—where he was seen by a physician.  *See* Second Am. Compl. Exs. at 23.

In Count XX, Plaintiff alleges, among other things, that Defendants Thompson and Stanley exhibited deliberate indifference to Plaintiff's back injury because they "refused to answer or return any request to staff dealing with [his] back injury," despite his submission of "numerous" requests.  Second Am. Compl. at 16; *see also id.* at 21. *But see* Second Am. Compl. Exs. at 51.[13]

Finally, in Count I, Plaintiff contends that he "was not allowed medical care for 5 months" for his "severely injured ([b]roken)" back due to policies established by Defendant Board of County Commissioners for the Sheriff's Department and County Jail, including policies for "the harassment of convicted felons (the poor), and the denial of

---

[13] The cited exhibit is a letter dated November 28, 2011, written by Plaintiff to Judge Linder, detailing, among other things, requests to staff that were allegedly stolen from Plaintiff.  *See* Second Am. Compl. Exs. at 49-52.  One such request to staff—"about gettin[g] a Doctor[']s [appointment] made by [a friend]"—was allegedly submitted by Plaintiff to Defendant Thompson.  *Id.* at 51.  Plaintiff states that Defendant Thompson "*answered* [by stating] that an [appointment] could be made but the sheriff would probably get the date changed, if [Plaintiff] would pay for it."  *Id.* (emphasis added).

medical care and equal protection of the law, for persons not born in Woodward County."[14]  *Id.* at 7.

## 2. Substantive Standard for Claim of Deliberate Indifference to Serious Medical Need

During the above described events, Plaintiff was a pretrial detainee. Through the Eighth Amendment's prohibition against cruel and unusual punishment, convicted prisoners are protected against the "unnecessary and wanton infliction of pain," which includes "deliberate indifference to [their] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted). Through the Fourteenth Amendment's due process clause, pretrial detainees are likewise protected, and the Eighth Amendment analysis for a claim of deliberate indifference to a serious medical need is applied identically whether involving a pretrial detainee or a convicted prisoner. *See Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009); *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999). "The right to custodial medical care is clearly established." *Olsen*, 312 F.3d at 1315 (citing *Estelle*, 429 U.S. at 104).

A constitutional violation based on deliberate indifference to a serious medical need involves an objective component and a subjective component. To meet the

---

[14] In Count I, Plaintiff cites an exhibit ("6-23," "6-24") but offers no explanation for its relevance to the claims in Count I. *See* Second Am. Compl. at 7; Fed. R. Civ. P. 10(c). The exhibit is a Request to Staff dated May 7, 2010, that Plaintiff submitted to "Medical" at LARC and appears to be further directed to "Dr. Houston" at that facility. *See* Second Am. Compl. Exs. at 23-24. Although Plaintiff alleges "very serious back pain," the Request to Staff does not clearly implicate any Defendant; nor does it establish an injury to Plaintiff's back. *See id.*

objective component, a plaintiff must allege facts to establish that the deprivation of rights is related to a serious medical need, i.e., "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (internal quotation marks omitted). For this analysis, the relevant question is "whether the alleged harm . . . is sufficiently serious"—not "whether the symptoms displayed to the prison employee are sufficiently serious." *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005). When the harm is alleged to have resulted from a delay in medical care, the harm must be "substantial," such as that resulting in a permanent disability or in substantial pain, including such injury or pain incurred while awaiting treatment. *Al-Turki v. Robinson*, No. 13-1107, __ F.3d __, 2014 WL 3906851, at *3 (10th Cir. Aug. 12, 2014); *see also Sealock*, 218 F.3d at 1210 ("[N]ot every twinge of pain suffered as the result of delay in medical care is actionable."); *Mata*, 427 F.3d at 753 (reiterating requirement for "significant, as opposed to trivial, suffering").

To meet the subjective component of a claim involving deliberate indifference to a serious medical need, a plaintiff must allege facts to establish that the defendant "acted or failed to act despite his [or her] knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). The defendant's knowledge is a question of fact and may be established, among other ways, through inference from circumstantial

evidence or "from the very fact that the risk was obvious."[15]  *Id.*  Only the symptoms that were presented to the prison employee are considered—i.e., whether "the symptoms [were] such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it."  *Mata*, 427 F.3d at 753; *see also Martinez*, 563 F.3d at 1089-90 (noting that defendant must have disregarded substantial risk of specific type of harm claimed by plaintiff).  Denying or delaying a prisoner's access to medical professionals capable of assessing or treating the prisoner's condition can establish the subjective component, particularly when unnecessary pain or a worsened condition results.  *See Mata*, 427 F.3d at 755; *Sealock*, 218 F.3d at 1211; *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980); *see also Estelle*, 429 U.S. at 104 (noting Eighth Amendment protection against "unnecessary and wanton infliction of *pain*" (emphasis added)).

3.  Whether Plaintiff Has Stated a Claim upon Which Relief May Be Granted for Deliberate Indifference to a Serious Medical Need

Under the standard detailed above, and assuming the facts of Plaintiff's Second Amended Complaint to be true, the undersigned will first consider whether Plaintiff has stated a claim upon which relief may be granted against (1) Defendants Stanley and Brewer in their individual capacities; and (2) Defendants Stanley, Thompson, Brewer, and the Board in any official capacities.  The undersigned does not consider whether

---

[15] Further, although a prison official may avoid liability by establishing that the obviousness of a risk escaped him, he may not avoid liability "if the evidence show[s] that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist."  *Farmer*, 511 U.S. at 843 n.8.

Plaintiff has stated such a claim against Defendant Thompson in her individual capacity because Defendants have conceded that point by arguing and presenting matters exclusively beyond the pleadings as to Defendant Thompson's liability for this claim. *See* Disp. Mot. 2 at 11-15, 29-34. The undersigned instead separately considers the individual-capacity claim(s) against Defendant Thompson below in determining whether she is entitled to summary judgment. *See* Fed. R. Civ. P. 12(d), 56.

a. Individual-Capacity Claims Against Defendants Stanley and Brewer

As to Defendants Stanley and Brewer in their individual capacities, Plaintiff has failed to allege sufficient facts to establish the subjective component of a claim for deliberate indifference to a serious medical need. For instance, Plaintiff asserts that he submitted to Defendant Stanley "numerous" requests to staff "dealing with [his] back injury," but he does not describe the contents of those requests; nor does he otherwise describe what symptoms he presented to Defendant Stanley regarding his alleged injury. *See* Second Am. Compl. at 16; *see also id.* at 21. Such factual allegations are required to establish whether Defendant Stanley acted or failed to act despite knowledge of a substantial risk of serious harm to Plaintiff. *See Farmer*, 511 U.S. at 842; *see also Mata*, 427 F.3d at 753; *Martinez*, 563 F.3d at 1089-90; *Daniels*, 474 U.S. at 330.

Further, to the extent Plaintiff is asserting that Defendant Stanley in his role as a supervisor engaged in deliberate indifference to Plaintiff's serious medical needs, Plaintiff has provided no facts to establish Defendant Stanley's participation—such as through specific instructions to a subordinate employee or through Defendant Stanley's promulgation, creation, implementation, or responsibility for the continuation of a

specific policy that resulted in such a constitutional violation. *See Iqbal*, 556 U.S. at 676-77; *Dodds*, 614 F.3d at 1199; *Schneider*, 717 F.3d at 767; *Pahls*, 718 F.3d at 1225, 1226. Plaintiff's minimal factual allegations are similarly insufficient to establish the requisite causation and state of mind for a supervisor liability claim against Defendant Stanley. *See Schneider*, 717 F.3d at 768-69; *Daniels*, 474 U.S. at 330; *Estate of Booker*, 745 F.3d at 435.

To the extent that Plaintiff is contending that Defendant Brewer exhibited deliberate indifference to his serious medical needs by taking Plaintiff to Urgent Care instead of to an emergency room, Plaintiff has failed to establish Defendant Brewer's knowledge of Plaintiff's alleged injury. *See* Second Am. Compl. at 9. That is, Plaintiff provides no factual allegations regarding the symptoms that he presented to Defendant Brewer at the relevant time, as would be required to demonstrate that Defendant Brewer acted or failed to act despite knowledge of a substantial risk of serious harm to Plaintiff. *See id.*; *Farmer*, 511 U.S. at 842; *Mata*, 427 F.3d at 753; *Martinez*, 563 F.3d at 1089-90; *Daniels*, 474 U.S. at 330.

In sum, Plaintiff's Second Amended Complaint should be dismissed to the extent he alleges that either Defendant Stanley or Defendant Brewer in their individual capacities exhibited deliberate indifference to Plaintiff's serious medical needs in violation of the Fourteenth Amendment's due process clause because Plaintiff has failed to provide sufficient factual allegations to establish the subjective component of such a claim.

b. Official-Capacity Claims Against Defendants Stanley, Thompson, Brewer, and the Board

As noted, a claim against a defendant in his or her official capacity is treated as against the governmental entity that the defendant represents. *Graham*, 473 U.S. at 166. Here, as to Defendants Stanley, Thompson, Brewer, and the Board, the relevant entity is Woodward County. Because only one entity is implicated as to these Defendants, the undersigned collectively analyzes the sufficiency of any official-capacity claims for deliberate indifference to a serious medical need.

Among other factual deficiencies, Plaintiff does not sufficiently identify a policy or custom of the County that impacted his ability to obtain medical care, which would be required for a municipal liability claim. *See Schneider*, 717 F.3d at 769-70. Instead, Plaintiff vaguely references "policies," including "unwritten policies," for "the harassment of convicted felons (the poor), and the denial of medical care and equal protection of the law, for persons not born in Woodward County." *See* Second Am. Compl. at 2, 7. Plaintiff does not further describe these alleged policies when discussing the actions of Defendants Stanley, Thompson, Brewer, or the Board. *See id.* at 2, 7, 8, 9-10, 16, 21.

Even if Plaintiff's broad allegations could be construed as suggesting "a well-settled custom or practice," Plaintiff's minimal factual assertions are insufficient to support a plausible claim. *See Schneider*, 717 F.3d at 770; *Iqbal*, 556 U.S. at 678-79. Plaintiff's factual assertions are strictly based on his limited personal experience and, thus, do not support the broad allegation that there is a County policy or custom, e.g., to

deny medical care—whether it be to convicted felons, the poor, or individuals not born in Woodward County. Further, having failed to sufficiently specify a policy or custom, Plaintiff cannot establish the remaining elements of municipal liability: that the policy or custom caused or was the "moving force" behind a violation of Plaintiff's federal rights and that the policy or custom "was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *See Schneider*, 717 F.3d at 769, 770-71.

Accordingly, Plaintiff's Second Amended Complaint should be dismissed without prejudice to the extent he alleges that Defendants Stanley, Thompson, Brewer, or the Board in their official capacities exhibited deliberate indifference to Plaintiff's serious medical needs in violation of the Fourteenth Amendment's due process clause because Plaintiff has failed to provide sufficient factual allegations to establish the requisite components of municipal liability for such a claim.

4. Whether Defendant Thompson Is Entitled in Her Individual Capacity to Summary Judgment on Plaintiff's Claim of Deliberate Indifference to a Serious Medical Need

Defendant Thompson has moved for summary judgment on the basis of qualified immunity from any claims against her for deliberate indifference to Plaintiff's serious medical needs. *See* Disp. Mot. 2 at 29-34, 43-46.[16] Defendant Thompson has incorporated by reference the materials in the Special Report, which includes her own

_____

[16] Defendant Thompson argues matters exclusively beyond the pleading as to such claims and, thus, does not challenge the sufficiency of Plaintiff's pleading. Accordingly, the undersigned has considered only whether Defendant Thompson is entitled to summary judgment on those claims. *See* Fed. R. Civ. P. 12(d), 56.

affidavits, affidavits of other individuals, and medical records of Plaintiff's visits to Urgent Care of Woodward.[17] *See* Disp. Mot. 2 at 27; *see also Hall*, 935 F.2d at 1111 (holding Special Report has same status as affidavit for summary judgment purposes when plaintiff has presented conflicting evidence).

As noted, discovery has been stayed in this matter at Defendants' request based on their qualified immunity defense, thereby limiting the evidence available to Plaintiff in challenging Defendants' dispositive motions. *See* Order, Doc. No. 131. Nevertheless, Plaintiff has responded to these motions. In addition to the facts set forth in his Second Amended Complaint, Plaintiff has addressed Defendants' statement of undisputed facts and has presented relevant evidence, including his own declaration, declarations from other inmates, and select medical records, in opposition. *See* Pl.'s Resp. to Disp. Mot. 2, Doc. No. 164; Pl.'s Resp. to Disp. Mot. Exs., Doc. No. 165-1, at 5-13, 15-21, 63-64. Further, Plaintiff's Second Amended Complaint and responses to Defendants' dispositive motions have each been signed under penalty of perjury, and so the undersigned treats these filings as sworn statements for the purpose of summary judgment to the extent these documents present factual allegations based on Plaintiff's personal knowledge. *See* Second Am. Compl. at 22; Pl.'s Resp. to Disp. Mot. 2 at 48; *Hall*, 935 F.2d at 1111; Fed. R. Civ. P. 56(c)(4).

---

[17] Defendant Thompson's affidavits are based on her "personal knowledge and/or Woodward County Jail records." *E.g.*, Def. Thompson Aff., S.R. Ex. 5, Doc. No. 114-5, at 7. To the extent that Defendant Thompson's statements are not based on her personal knowledge, they are not appropriate for consideration at summary judgment. *See* Fed. R. Civ. P. 56(c)(4).

Because a pretrial detainee's constitutional right to medical care while in custody was clearly established at the relevant time, the undersigned turns to consider whether Plaintiff has shown that Defendant Thompson violated his right to due process in the context of the Eighth Amendment's inherent prohibition against deliberate indifference to a serious medical need. *See Olsen*, 312 F.3d at 1315. If disputed material facts sufficiently implicate either the objective component or the subjective component of such a claim, summary judgment cannot be granted. *Id.* at 1315-16. Having considered the evidence and reasonable inferences in the light most favorable to Plaintiff, the undersigned finds that genuine issues of material fact exist, as illustrated by the examples presented below, and, thus, summary judgment should not be granted on this claim.

    a. Objective Component

As to the objective component—i.e., whether the alleged harm is sufficiently serious—Plaintiff alleges that he has a back injury from which he unnecessarily suffered pain as a result of delayed and inadequate care. To establish that an alleged delay in care was unconstitutional, Plaintiff must establish that his pain was substantial while he was awaiting care. *See Al-Turki*, 2014 WL 3906851, at *3; *Mata*, 427 F.3d at 753.

Although Defendants admit that Plaintiff "was prescribed and provided medications" for his back pain, Defendants contend that Plaintiff's alleged back injury could not be sufficiently serious because he "has never been diagnosed with more than a back strain" and "[t]here is simply no evidence that [he] experienced . . . considerable pain . . . as a result of the alleged denial or delay." *See* Disp. Mot. 2 at 31, 32. In response, Plaintiff has presented evidence through his own sworn statements that during

the booking process after his June 2009 arrest, "he had to [lie] on the floor of the booking area" because "his back was hurting/cramping so bad[ly]." Pl.'s Decl., Doc. No. 165-1, at 5. Plaintiff also states that a jail employee "had to help [Plaintiff to] stand up" and that Plaintiff's back made "snap, crackle, and pop noises."[18] *Id.* Plaintiff states that he was assigned to a "3rd tier, top bunk" in WCJ's day room, causing him "intense pain" when "climb[ing] to the third tier." Pl.'s Decl., Doc. No. 165-1, at 5; *see also* S.R. Ex. 18 at 1 (confirming assignment to day room's emergency beds but not specifying bunk assignment); Jessie Tuck Decl., Doc. No. 165-1, at 9 (corroborating that Plaintiff had to "climb to the third bunk . . . at the very top of the housing unit" (capitalization altered)). Plaintiff asserts that bruises covered his "entire lower back," and he believed and

---

[18] Defendants dispute Plaintiff's contention that he was injured during his arrest, citing declarations from two of the arresting officers—Defendants Munson and Rea, against whom claims in this matter are currently stayed—who each stated that Plaintiff had "no visible injuries . . . as a result of his arrest" and "did not complain of any injuries during the time [they] were transferring him to the Woodward County Deputy." *See* Disp. Mot. 2 at 13; Def. Munson Decl., S.R. Ex. 21, Doc. No. 114-21, at 2; Def. Rea Decl., S.R. Ex. 26, Doc. No. 114-26, at 3. In a sworn statement based on "personal knowledge and/or Woodward County Jail records," Defendant Thompson nevertheless appears to acknowledge that Plaintiff had some type of back injury:

> It was known to jail staff, as a result of previous incarcerations as well as Mr. Harper's own comments that he had had previous back issues and that the injury/back pain about which he was complaining during this time was an injury preexisting prior to his June 2009 incarceration in the Woodward County Jail.

Def. Thompson Aff., S.R. Ex. 5, Doc. No. 114-5, at 7. Because a claim of deliberate indifference to a serious medical need turns on the *existence* of a medical need and not its cause, it is immaterial whether the back injury about which Plaintiff complained occurred before his transfer to Woodward County Jail.

continues to believe that his back may have been broken. *See* Second Am. Compl. at 8, 21; Pl.'s Resp. to Disp. Mot. 2 at 26; Pl.'s Decl., Doc. No. 165-1, at 8.

Plaintiff has submitted a declaration from an inmate who witnessed that Plaintiff's "back was bruised [in] several areas" when Plaintiff was "booked in the [Woodward] County Jail." Jessie Tuck Decl., Doc. No. 165-1, at 9 (capitalization altered). Plaintiff asserts that "30 days after [his] arrest" when he was taken to Urgent Care, the bruises on his back "were still readily apparent." *See* Pl.'s Decl., Doc. No. 165-1, at 6; Pl.'s Resp. to Disp. Mot. 2 at 10. *But see* Pl.'s Resp. to Disp. Mot. 2 at 28 (indicating "massive bruising went away" before medical care was provided). Plaintiff notes that a nurse practitioner prescribed Mobic for pain but did not order x-rays or further examinations of his back.[19] *See* Pl.'s Decl., Doc. No. 165-1, at 6; Pl.'s Resp. to Disp. Mot. 2 at 10; *see also* S.R. Ex. 2 at 7-8 (July 29, 2009 Urgent Care record).

---

[19] Contrary to the statements in his Second Amended Complaint that medical care was entirely denied from June 2009 through November 2009, Plaintiff concedes that he received medical care from a nurse practitioner at Urgent Care on July 29, 2009, and September 24, 2009. *See* Pl.'s Resp. to Disp. Mot. 2 at 10, 28. Defendants assert as an undisputed fact that during Plaintiff's July 2009 visit to Urgent Care, Plaintiff "was evaluated and treated . . . for sinus, stomach and hand issues" but "did not complain of any back injuries." Disp. Mot. 2 at 11, 13; *see also id.* at 31. Plaintiff admits that he was treated for "a head cold." Pl.'s Resp. to Disp. Mot. 2 at 10; *see also* S.R. Ex. 2 at 8 (reflecting clinical impressions of acute sinusitis and exudative pharyngitis). He asserts, however, that he also presented back pain signs and symptoms, resulting in the prescription for Mobic. *See* Pl.'s Resp. to Disp. Mot. 2 at 10; *see also* S.R. Ex. 2 at 8 (reflecting prescription for Mobic). Plaintiff contends that the medical record does not expressly reflect his back pain signs and symptoms because the nurse practitioner had been instructed not to treat this condition, as it was an allegedly preexisting condition. Pl.'s Resp. to Disp. Mot. 2 at 10; Pl.'s Decl., Doc. No. 165-1, at 5-6. Regardless of Plaintiff's speculation as to instructions given to the nurse practitioner, Mobic is a

Plaintiff contends that he continued to be in "'severe pain'" during the ensuing months. Pl.'s Decl., Doc. No. 165-1, at 5. Among other things, Plaintiff asserts that he intentionally injured his ear in September 2009 with the hope of being taken to the hospital where he could receive treatment for his back pain. *See* Pl.'s Resp. to Disp. Mot. 2 at 10. Plaintiff was instead taken to a nurse practitioner at Urgent Care who prescribed Mobic after diagnosing Plaintiff with a back strain (which he contends was an understatement of his condition). *See* Pl.'s Resp. to Disp. Mot. 2 at 10; S.R. Ex. 2 at 5-6 (indicating patient reported severity of back pain as 10/10). Plaintiff then attempted to arrange an appointment at his own expense with a chiropractor in November 2009. Pl.'s Decl., Doc. No. 165-1, at 7; Pl.'s Resp. to Disp. Mot. 2 at 11. It is undisputed that Plaintiff was not permitted to attend this appointment. *See* Disp. Mot. 2 at 12, 14; Pl.'s Resp. to Disp. Mot. 2 at 11; Pl.'s Decl., Doc. No. 165-1, at 7. Plaintiff was instead taken to a nurse practitioner at Urgent Care who diagnosed Plaintiff with back pain and prescribed Mobic, as well as Tramadol. *See* Pl.'s Resp. to Disp. Mot. 2 at 11; S.R. Ex. 2 at 3-4. Plaintiff asserts that at this time he "could barely walk upright." Pl.'s Decl., Doc. No. 165-1, at 7. Then, in March 2010, after allegedly being promised and then denied a visit to an emergency room, Plaintiff agreed to return to Urgent Care to seek treatment for his back pain, despite his reservations about the adequacy of care that could be provided. *See* Pl.'s Decl., Doc. No. 165-1, at 7-8; Second Am. Compl. at 9. Regardless of the

---

nonsteroidal anti-inflammatory drug that may be used to treat back pain. *See* Kim Peterson et al., *Drug Class Review: Nonsteroidal Antiinflammatory Drugs (NSAIDS): Final Report* 9, 13 (2010), *available at* http://www.ncbi.nlm.nih.gov/books/NBK53955/pdf/TOC.pdf.

parties' differing accounts as to what transpired during this visit to Urgent Care, the medical record reflects a nurse practitioner's clinical impression that Plaintiff had acute low back pain. *See* Disp. Mot. 2 at 12, 15-16; Pl.'s Resp. to Disp. Mot. 2 at 11, 12-13; Pl.'s Decl., Doc. No. 165-1, at 7-8; S.R. Ex. 2 at 1-2.

Plaintiff has submitted medical records that evidence some degree of back injury, including that in October 2011 he was diagnosed with mild spondylosis, mild degenerative disc disease, and an anterior wedge deformity in his lower back.[20] *See* Sooner Radiology Report, Doc. No. 165-1, at 63. Such conditions are commonly associated with pain, which may lead to treatment with medications, including opioids.[21] Citing the Urgent Care medical records submitted with the Special Report, as discussed above, Plaintiff emphasizes that he was consistently prescribed pain medication for back pain and was diagnosed with acute low back pain in March 2010. *See* Pl.'s Resp. to Disp. Mot. 2 at 10-11, 27; S.R. Ex. 2 at 1-6; *see also* Woodward Hospital Report, S.R.

---

[20] Plaintiff also contends that May 2010 x-rays revealed multiple vertebrae fractures. Plaintiff asserts that after his transfer from WCJ to LARC, x-rays were taken of his back, and he was permitted to view these x-rays and a radiologist's report. Pl.'s Resp. to Disp. Mot. 2 at 26; Pl.'s Decl., Doc. No. 165-1, at 8. Plaintiff states that, although the radiologist's report indicated there were no new fractures, "[t]he x-rays showed numerous fractures in each and every vertebra[] . . . in the lower half of [his] back." Pl.'s Resp. to Disp. Mot. 2 at 26 (emphasis and internal quotation marks omitted); *see also* Pl.'s Decl., Doc. No. 165-1, at 8 (asserting "[a]ll of the vertebrae[] in the lower half of [his] back had fractures"). Plaintiff then asserts that, as of July 2013, "nobody working for [ODOC] could] find these x-rays, or the corresponding radiologist['s] report." Pl.'s Decl., Doc. No. 165-1, at 8; *see also* Pl.'s Resp. to Disp. Mot. 2 at 26.

[21] *See, e.g.*, Kimberley Middleton & David E. Fish, *Lumbar Spondylosis: Clinical Presentation and Treatment Approaches*, 2 Current Revs. Musculoskeletal Med. 94, 94-104 (2009), *available at* http://link.springer.com/content/pdf/10.1007%2Fs12178-009-9051-x.pdf.

Ex. 3, Doc. No. 114-3, at 3-5 (reflecting July 2010 prescription for Mobic after low back pain reported as 7/10). Plaintiff states that he continues to experience back pain and to receive prescription pain medications. *See* Pl.'s Resp. to Disp. Mot. 2 at 27.

As for the October 2011 diagnosis referenced by Plaintiff, a physician found—based on two views from a radiographic examination—that Plaintiff had the conditions noted above but "[n]o acute fracture." Sooner Radiology Report, Doc. No. 165-1, at 63. As to a "5% anterior wedge deformity of L1," the physician found without elaboration that it was "likely a developmental condition," further noting that "[t]he [l]umbar alignment and vertebral body heights are maintained otherwise." *See id*. In September 2012—i.e., approximately eleven months later—x-rays were taken and subsequently reviewed by a different physician who found "[n]o evidence of fracture or boney destruction," well preserved disk spaces, and normal alignment, leading the physician to conclude that Plaintiff had a "normal lumbosacral spine." *See* EMDS Report, Doc. No. 165-1, at 64 (capitalization altered).[22]

In summary, the objective medical evidence—and the undisputed facts that may be derived therefrom—indicates that Plaintiff while at the Woodward County Jail had a back injury capable of causing significant pain, but also suggests that Plaintiff may be overstating the severity of the injury and pain he experienced. Such evidence,

---

[22] Plaintiff attempts to reconcile the 2011 and 2012 findings by offering the lay opinion that the "injury" to his spine had healed, although he continues to suffer pain. *See* Pl.'s Resp. to Disp. Mot. 2 at 26-27 (citing Sooner Radiology Report as "Att. 22" and EMDS Report as "Att. 23").

particularly given its gaps in scope and timing, cannot be said to entirely refute the possibility that Plaintiff's injury may have caused "significant, as opposed to trivial, suffering." *See Mata*, 427 F.3d at 753. In other words, while it is possible that Plaintiff's account of the severity of his injury may be overcome for purposes of summary judgment by substantial evidence to the contrary, *see Scott v. Harris*, 550 U.S. 372, 380 (2007), Defendant's evidence does not meet that standard—at least at this early stage of the case, prior to a greater opportunity to conduct discovery. After considering all of the evidentiary material presented by the parties, and drawing reasonable inferences in the light most favorable to Plaintiff, the undersigned finds that a genuine dispute of material fact exists regarding the objective component of Plaintiff's claim. Limited discovery, including discovery of Plaintiff's other relevant medical records, may further clarify whether a genuine dispute of material fact exists as to the seriousness of Plaintiff's alleged injury.

b. Subjective Component

For this element, the question is whether a genuine and material factual dispute exists as to Defendant Thompson's knowledge of Plaintiff's alleged medical need or as to the propriety of Defendant Thompson's conduct in light of such knowledge. *See Olsen*, 312 F.3d at 1315-16. Plaintiff alleges that, the day after his arrest, he told Defendant Thompson that he "needed to see a doctor" because his "back hurt real, real bad." *See* Second Am. Compl. at 8. He further alleges that he "showed her the bruises, thrice"— bruises that allegedly covered his "entire lower back." *See* Second Am. Compl. at 8, 21; *see also* Pl.'s Decl., Doc. No. 165-1, at 5 (asserting that Plaintiff showed Defendant

Thompson "the severe bruising on numerous occasions"). Plaintiff has also submitted a declaration from an inmate who, as noted above, observed Plaintiff's bruises and also "witness[ed] [Mr.] Harper bringing to attention of his back injuries to [Defendant Thompson] several attemp[t]s a day for the whole month and few days he was in the day room."[23] *See* Jessie Tuck Decl., Doc. No. 165-1, at 9 (referring to Defendant Saunnie Thompson as "Mrs. Sony").

Although not providing specific facts or supporting documents, Plaintiff further contends that he submitted "numerous" requests to Defendant Thompson "dealing with [his] back injury." Second Am. Compl. at 16; *see also id.* at 21. He also contends that, in light of Defendant Thompson's refusal to send him to a doctor, he obtained permission from Defendant Thompson to arrange his own appointment with a chiropractor at his own expense. *See* Second Am. Compl. at 2, 8; Pl.'s Resp. to Disp. Mot. 2 at 11, 28; *see also* S.R. Ex. 2 (reflecting visits with nurse practitioner(s) only). Plaintiff asserts that despite granting permission, Defendant Thompson then canceled the appointment "for security reasons" but did not reschedule the appointment to avoid the cited concerns.

_____

[23] According to a WCJ Cell Log submitted by Defendants, Plaintiff was assigned to the day room from June 30, 2009, to July 20, 2009. *See* Harper Cell Log, S.R. Ex. 18, Doc. No. 114-18, at 1. Plaintiff disputes the accuracy of this cell log, asserting that he was moved from his third-tier bunk in the day room to a bottom bunk in Cell 5 only after the move to a bottom bunk was recommended at his first Urgent Care appointment—i.e., on July 29, 2009. *See* Pl.'s Resp. to Disp. Mot. 2 at 10. As evidence of the cell log's potential for inaccuracy, Plaintiff cites a notation on the log regarding a cell assignment change for a seemingly inconceivable circumstance as to Plaintiff: "out for work back tonight." *See* Pl.'s Resp. to Disp. Mot. 2 at 10; Harper Cell Log at 1. Plaintiff asserts that, because of a $250,000 bond, he was unable to leave WCJ. *See* Pl.'s Resp. to Disp. Mot. 2 at 10.

Second Am. Compl. at 8; *see also* Pl.'s Resp. to Disp. Mot. 2 at 11, 28. Plaintiff disputes the adequacy of Defendant Thompson's decision to send him instead to Urgent Care where he was evaluated by a nurse practitioner who did not order x-rays. *See* Pl.'s Resp. to Disp. Mot. 2 at 11, 28; *see also* S.R. Ex. 2 (reflecting that x-rays were not ordered during any visit to Urgent Care).

Ultimately, Plaintiff contends that Defendant Thompson caused him to unnecessarily suffer substantial pain by first delaying care and then restricting him to receiving treatment only through Urgent Care, which he contends was inadequate. Plaintiff speculates that Defendant Thompson sought through her actions to control costs and to prevent Plaintiff from being able to establish the seriousness of his injuries. *See* Pl.'s Resp. to Disp. Mot. 2 at 11, 12, 27, 28. The speculative nature of these assertions aside, Plaintiff also states that Defendant Thompson restricted Plaintiff's access to medical care "because she said [his] injury was pre-existing." Pl.'s Resp. to Disp. Mot. 2 at 28.

Defendant Thompson states that (1) "WCJ did not have a primary care provider but used the local Urgent Care of Woodward or the Woodward Regional Hospital to provide medical care to inmates"; and (2) in her role as Jail Administrator—i.e., since February 2009—Defendant Thompson was the sole WCJ employee tasked with addressing inmate requests for medical care. *See* Def. Thompson Aff., S.R. Ex. 5, at 1, 4; *see also* Disp. Mot. 2 at 12 (noting that "WCJ did not have an on-staff medical person"). Defendant Thompson admits that Plaintiff submitted "some" requests for medical care and prescription refills. Def. Thompson Aff., S.R. Ex. 5, at 2, 3 (omitting specific type of

care or prescriptions requested). Copies of these requests were not retained by WCJ, but Defendant Thompson is nevertheless confident that "[e]very [r]equest [she] received from Plaintiff was responded to and appropriate action was taken." Def. Thompson Aff., S.R. Ex. 5 at 1-2; *see also* Disp. Mot. 2 at 13.

From the fact that Plaintiff was sent to Urgent Care on four occasions and that such treatment could only be arranged through Defendant Thompson, it is reasonable to infer that Plaintiff presented some symptoms to Defendant Thompson. Moreover, Defendant Thompson acknowledges that Plaintiff complained about an "injury/back pain":

> It was known to jail staff, as a result of previous incarcerations as well as Mr. Harper's own comments that he had had previous back issues and that the injury/back pain about which he was complaining during this time was an injury preexisting prior to his June 2009 incarceration in the Woodward County Jail.

Def. Thompson Aff., S.R. Ex. 5, at 7.

Defendant Thompson never directly addresses Plaintiff's allegations regarding the specific symptoms that he presented to her; nor does she identify any symptoms that were presented to her by Plaintiff at any point during his incarceration at WCJ. *See* Def. Thompson Aff., S.R. Ex. 5. Instead, Defendant Thompson indirectly denies Plaintiff's allegations by implying that his account is inconsistent with WCJ general practices regarding medical care for inmates—i.e., Defendant Thompson's practices of "mak[ing] every attempt to address [an inmate's request for medical care] within 48 hours" and, when deemed appropriate by Defendant Thompson, "secur[ing] the reasonable and necessary care." *See* Def. Thompson Aff., S.R. Ex. 5, at 1-2; *see also* Disp. Mot. 2 at 12-

13. Defendant Thompson also provides a summary of Plaintiff's medical care based on medical records from Urgent Care.[24] *See* Def. Thompson Aff., S.R. Ex. 5, at 4; *see also* Def. Thompson Aff., S.R. Ex. 27, Doc. No. 114-27, at 1 (noting Defendant Thompson's responsibility for maintaining inmate medical records).

Neither this reference to general practices nor the description of Plaintiff's complaints to others is an adequate substitute for Defendant Thompson's own account of Plaintiff's symptoms as presented to her. The fact that a practice existed is not proof that it was consistently adhered to.[25] And the fact that certain complaints were recorded at Urgent Care does not mean that other complaints were not raised to Defendant Thompson. Such records do not negate Plaintiff's version of events. *See Mata*, 427 F.3d at 753; *cf. Al-Turki*, 2014 WL 3906851, at *4-5.

For instance, citing the two-page "Upper Respiratory Symptoms / Fever" fill-in-the-blank form record of Plaintiff's first visit to Urgent Care (on July 29, 2009), Defendant Thompson asserts that Plaintiff did not complain of a back injury, which to

---

[24] Although the summary is based on the medical records ("[m]edical records indicate"), it does not accurately reflect those records in all instances. *Compare* Def. Thompson Aff., S.R. Ex. 5, at 4 (asserting "Mr. Harper was evaluated and treated at Urgent Care of Woodward on July 29, 2009[,] for sinus, stomach and hand issues"), *with* S.R. Ex. 2 at 7-8 (indicating that Plaintiff presented a past history of ulcers and hand surgery but reflecting no treatment specifically related to those conditions).

[25] Defendant Thompson's broad assertion—written approximately three years after Plaintiff's initial departure from WCJ and in the absence of recordkeeping—that "[e]very Request [she] received from Mr. Harper was responded to and appropriate action was taken" does not dispositively contradict Plaintiff's account, particularly given that Defendant Thompson was the sole determiner of "appropriate action." *See* Def. Thompson Aff., S.R. Ex. 5, at 2 (indicating "appropriate action" could include medical care when "reasonable and necessary"); Disp. Mot. 2 at 13, 31.

some extent suggests that Plaintiff had not reported his back injury symptoms to her. *See* Disp. Mot. 2 at 13, 31. Plaintiff disputes this assertion and notes, among other things, that he received a prescription for Mobic during that visit, which he contends was prescribed in response to his presentation of signs and symptoms of back pain. *See* Pl.'s Resp. to Disp. Mot. 2 at 10; S.R. Ex. 2 at 8 (reflecting prescription for Mobic); *see also supra* note 19 and accompanying text. In light of this prescription for Mobic, which was also prescribed to Plaintiff during two subsequent visits to Urgent Care when back pain complaints were expressly addressed, it is reasonable to infer that the form medical record may not reflect the entirety of Plaintiff's complaints during his July 2009 visit to Urgent Care. *See* S.R. Ex. 2 at 3-6.

Finally, Defendant Thompson contends that she should not be found to have perceived Plaintiff's conditions as serious where "[n]o additional treatment for [Plaintiff's] back had been ordered by any medical professional." *See* Def. Thompson Aff., S.R. Ex. 5, at 5; *see also* Disp. Mot. 2 at 13, 32. But, as previously discussed regarding the objective component of a deliberate indifference claim, there is a question of fact as to the extent of Plaintiff's back injury and pain, and, in any event, Defendant Thompson may not now justify her course of action through the benefit of hindsight. *Cf. Al-Turki*, 2014 WL 3906851, at *4-5. Moreover, medical records that Defendant Thompson was responsible for maintaining—and thus presumably knew of—indicate that on three out of four occasions, Urgent Care personnel recommended that Plaintiff seek follow-up care with a primary care provider. *See* S.R. Ex. 2 at 6 (September 24, 2009 record reflecting recommendation for follow-up with primary care provider), 4

40

(November 25, 2009 record reflecting same), 2 (March 16, 2010 record reflecting same); Def. Thompson Aff., S.R. Ex. 27, Doc. No. 114-27, at 1.

In sum, Defendant Thompson had some knowledge of Plaintiff's condition during his time at WCJ, and Defendant Thompson knew that whether Plaintiff received medical care was her decision. Her assertions discussed above do not dispel Plaintiff's allegations, much less establish as an undisputed fact, that Defendant Thompson lacked knowledge of a substantial risk that Plaintiff would suffer substantial back pain unnecessarily; nor do they adequately dispel Plaintiff's allegations that her conduct in light of such knowledge was in reckless disregard of that risk. *See Farmer*, 511 U.S. at 842; *Mata*, 427 F.3d at 753; *Olsen*, 312 F.3d at 1316-17; *Martinez*, 563 F.3d at 1089-90. In consideration of the evidence discussed above, a reasonable jury could find, for instance, that Plaintiff reported his "intense" and "severe" back pain, as well as bruises, to Defendant Thompson on multiple occasions, and further could find that Plaintiff suffered substantial pain unnecessarily because she did not arrange for his medical care for a month—i.e., until he became otherwise ill in July 2009, and she deemed him in need of care. *See* Pl.'s Decl., Doc. No. 165-1, at 5; *Anderson*, 477 U.S. at 248-49; *Mata*, 427 F.3d at 753, 755; *see also Martinez*, 563 F.3d at 1089-90. A reasonable jury could also find that Plaintiff suffered substantial pain unnecessarily because, despite Plaintiff's ongoing complaints of back pain to Defendant Thompson, she restricted his access to

medical professionals capable of assessing or treating his condition.[26] *See Mata*, 427 F.3d at 755; *Sealock*, 218 F.3d at 1211; *Ramos*, 639 F.2d at 575. Ultimately, Defendant Thompson's undisputed conduct of arranging four visits to nurse practitioners at Urgent Care for Plaintiff over the course of approximately nine months and providing consequently prescribed pain medications to Plaintiff does not refute the possibility— suggested by Plaintiff's sworn statements and evidence—that Defendant Thompson recklessly disregarded his complaints of substantial back pain, causing him to suffer such pain unnecessarily while awaiting care.

---

[26] Defendants contend that Plaintiff "[s]imply . . . disagrees with the medical care provided" and that such disagreement cannot give rise to a constitutional violation. *See* Disp. Mot. 2 at 33; *see also* Cnty. Defs.' Reply, Doc. No. 168, at 5. When a prisoner has been seen by a medical professional, and the diagnosis and treatment prescribed by that professional has been properly acted on, the prisoner may not establish a constitutional violation merely by stating that he disagrees with the diagnosis and treatment or even by showing that such diagnosis and treatment were medically negligent. *See Duffield v. Jackson*, 545 F.3d 1234, 1239 (10th Cir. 2008); *Ramos*, 639 F.2d at 575. Here, Plaintiff has asserted more than mere disagreement with the determinations of a medical professional. *See, e.g., Oxendine v. Kaplan*, 241 F.3d 1272, 1277 & n.7 (10th Cir. 2001). Plaintiff's assertions include that Defendant Thompson—who has not been established to have had any medical training—did not take Plaintiff to see any medical professional between Plaintiff's June 29, 2009 arrest and his July 29, 2009 visit to Urgent Care and, for several months thereafter, only permitted Plaintiff to be treated by a nurse practitioner at Urgent Care. As to the initial month delay in seeking treatment, Defendant Thompson has not established that any medical professional was involved in that decision. As for the subsequent treatment, while Defendant Thompson's reasonable reliance on medical opinions from Urgent Care might, if established, negate some or all of Plaintiff's claim, there are disputed questions about the scope of those opinions. Among other things, as previously discussed, medical records indicate that Urgent Care personnel recommended—in September 2009, November 2009, and March 2010—that Plaintiff seek follow-up care with a primary care provider. *See* S.R. Ex. 2 at 6, 4, and 2.

Based on the foregoing analysis, the undersigned cannot say at this preliminary stage that undisputed material facts preclude a finding in Plaintiff's favor as to either the objective or subjective component of his claim against Defendant Thompson in her individual capacity for deliberate indifference to a serious medical need. The undersigned recommends that summary judgment as to this claim be denied accordingly. *See Olsen*, 312 F.3d at 1315-16. The undersigned further recommends that the case continue to be referred to him for the purpose of overseeing limited discovery as to this claim. *Cf. Mitchell*, 472 U.S. at 526; *Iqbal*, 556 U.S. at 684-86.

E. *Whether Plaintiff Has Stated or Supported a Claim of Deliberate Indifference to Inmate Health and Safety (Counts IX, XXI)*

1. Factual Allegations in Second Amended Complaint

a. Allegations Against Defendants Thompson and Brewer

In Count IX of his Second Amended Complaint, Plaintiff alleges that in February 2010, Defendants Thompson and Brewer moved another inmate, Justin Brown or "JB," "out of Max 7 (for repeated fights) and put him in [Plaintiff's] cell to overcrowd it . . . to get JB to force [Plaintiff] to fight."[27]  Second Am. Compl. at 11. More specifically, Plaintiff asserts:

---

[27] Plaintiff interlineated "with deliberate indifference" and "mali[]ciously and sadistically" above and below this sentence on his pleading, but it is not clear precisely where he intended these terms to be read into the sentence. *See* Second Am. Compl. at 11. Plaintiff contends that the actions described in Count IX violated his rights to due process and equal protection under the Fourteenth Amendment. *Id.* Plaintiff's due process claim is addressed in this section. Plaintiff has alleged multiple violations of his right to equal protection, which are addressed in a separate section below.

JB had been placed in Max for fighting in every cell they put him in[.]  JB
was being railroaded and was mad as hell.  He tried to make me fight him,
twice[;] all I could do is [lie] on the floor, and hold his wrists, to keep from
getting hit.  On the second incident (3-15-10), [Defendant Brewer] stood at
the door and laughed as JB got me in a choke hold.  He opened the door so
JB would fall backwards[.]  I landed on my head.

Second Am. Compl. at 11.

### b.  Allegations Against Defendant Stanley

In Count XXI of his Second Amended Complaint, Plaintiff alleges that in late

November 2011, in retaliation for the filing of two civil lawsuits, Defendant Stanley

"intentionally had [Plaintiff] put in pod E, cell 1."[28]  *See* Second Am. Compl. at 17.

Plaintiff further explains, "the deputy jailer that put me in there said that is where Gary

Stanley said to put me."  *Id.*  Plaintiff then asserts that "[t]he toilet in that cell did not

flush" because "[t]he water was not turned on to the toilet" for approximately one week.

*Id.*  Plaintiff describes the toilet as "full of rancid urine and rotting feces," causing him to

gag "[w]hen [he] urinated in the toilet."  *Id.*

After approximately two days of the toilet not functioning, Plaintiff decided to

defecate in a toilet-paper-lined food tray, asserting that he "did not want to catch a

---

[28] Plaintiff alleges that the conduct described in Count XXI violated his right to access
the courts, his Eighth Amendment right to be free from cruel and unusual punishment,
and his Fourteenth Amendment rights to due process and equal protection.  Second Am.
Compl. at 16-17.  Plaintiff's due process claim (to the extent he is challenging a condition
of confinement) and his cruel and unusual punishment claim are addressed together in
this section as a prison conditions claim.  Plaintiff's alleged violations of his right to
equal protection and right to access the courts (construed in this circumstance as a
retaliation claim) as well as his due process claim (to the extent he is challenging a prison
disciplinary conviction), are addressed in separate sections below.

disease." *See id.* (emphasis omitted). Plaintiff states that it was his intention to clean the tray when the water was restored. *See id.* However, the water was not restored, and Plaintiff was required to return the tray in exchange for his next meal. *See id.* Plaintiff states, "I got a class X misconduct report, and lost [a number of] days for 08-4X, adulteration of food or drink[.] [T]here was no food or drink in the tray. I also received a misconduct for indecent exposure, 10-3A, I was found not guilty."[29] *Id.* (citations omitted). Plaintiff contends:

> If I would have been found guilty of [the indecent exposure] misconduct[,] I would be on [O]DOC's sex offender list. There is no place safe from that[.] I'd get beat on everywhere[.] [T]hat was Gary Stanley[']s intention, when I was put in a cell without a working toilet, that was full of rancid piss and rotting feces.

*Id.*

2. <u>Substantive Standard for Claim of Deliberate Indifference to Inmate Health and Safety</u>

The standard applicable to claims of deliberate indifference to inmate health or safety is generally consistent with that applied to claims of deliberate indifference to a serious medical need, discussed above, but focuses on other prison conditions. Regardless of Plaintiff's status as a pretrial detainee or convicted prisoner, the same standard applies, requiring that the claim be analyzed in light of the Eighth Amendment's

---

[29] Plaintiff appears to state "441" as the number of days lost, but the handwritten number is not clear.

prohibition against cruel and unusual punishment.[30]  *See Craig v. Eberly*, 164 F.3d 490,

495 (10th Cir. 1998); *Lopez*, 172 F.3d at 759 n.2.

As interpreted, the Eighth Amendment imposes duties on prison officials to

"provide humane conditions of confinement . . . [by] ensur[ing] that inmates receive

adequate food, clothing, shelter, and medical care, and . . . [by] tak[ing] reasonable

measures to guarantee the safety of the inmates."  *Farmer*, 511 U.S. at 832 (internal

quotation marks omitted).  Comfortable prisons, however, are not mandated by the

Constitution; conditions may be harsh.  *Id.* at 832-33; *Rhodes v. Chapman*, 452 U.S. 337,

347, 349 (1981).  To establish an Eighth Amendment violation based on a condition of

confinement, a prisoner must establish that (1) the condition objectively posed a

substantial risk of serious harm to the prisoner's health or safety, and (2) the defendant

exhibited deliberate indifference to this risk, i.e., that the defendant knew of and

disregarded the "excessive risk to inmate health or safety."  *See Farmer*, 511 U.S. at 834-

35, 837; *see also DeSpain v. Uphoff*, 264 F.3d 965, 971 (10th Cir. 2001).

3.  Whether Plaintiff Has Stated an Official-Capacity Claim upon Which Relief
    May Be Granted for Deliberate Indifference to Inmate Health and Safety

To the extent that Plaintiff is asserting the above prison-conditions claims against

Defendants Thompson, Brewer, and Stanley in their official capacities, Plaintiff has not

---

[30] During the events in Count IX, Plaintiff was a pretrial detainee, thereby implicating the
Fourteenth Amendment's due process clause, but during the events described in Count
XXI, Plaintiff was serving a portion of a suspended sentence that had been revoked and
was temporarily at WCJ awaiting a court appearance, thereby implicating the Eighth
Amendment's cruel and unusual punishment clause.  *See infra* note 43; *Lopez*, 172 F.3d
at 759 n.2.

identified a specific policy or custom of Woodward County as required to state a municipal liability claim.[31]  *See* Second Am. Compl. at 11, 16-17; *Graham*, 473 U.S. at 166.  Plaintiff's factual assertions are strictly based on his limited personal experience and, thus, do not support a reasonable inference that a County policy or custom is implicated in his claims.  Having failed to sufficiently specify a policy or custom, Plaintiff cannot establish the remaining elements of municipal liability—i.e., that the policy or custom caused or was the "moving force" behind a violation of Plaintiff's federal rights and that the policy or custom "was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury."  *See Schneider*, 717 F.3d at 769, 770-71.

Accordingly, because Plaintiff has failed to provide sufficient factual allegations to establish requisite components of municipal liability, Plaintiff's Second Amended Complaint should be dismissed without prejudice to the extent he alleges that (1) Defendants Thompson or Brewer in their official capacities exhibited deliberate indifference to Plaintiff's health and safety in violation of the Fourteenth Amendment's due process clause, or (2) Defendant Stanley in his official capacity exhibited deliberate indifference to Plaintiff's health and safety in violation of the Eighth Amendment's cruel and unusual punishment clause.

---

[31] Plaintiff did not assert this claim against Defendant Routh or Defendant Board of County Commissioners.

4. <u>Whether Defendants Thompson, Brewer, and Stanley Are Entitled in Their Individual Capacities to Summary Judgment on Plaintiff's Claims of Deliberate Indifference to Inmate Health and Safety</u>

a.  Individual-Capacity Claims Against Defendants Thompson and Brewer

In response to Plaintiff's allegations in Count IX above, Defendants Thompson and Brewer challenge Plaintiff's claim on the facts.  Thus, the undersigned considers only whether these Defendants are entitled to summary judgment.  *See* Fed. R. Civ. P. 12(d). When considering the evidence and inferences in the light most favorable to Plaintiff, it is clear that Plaintiff has not established a constitutional violation, and thus, Defendants Thompson and Brewer are entitled to qualified immunity in their individual capacities as to Plaintiff's claim in Count IX that they exhibited deliberate indifference to his health and safety.

Defendants Thompson and Brewer generally concede that an altercation between Plaintiff and inmate Justin Brown may have occurred on March 15, 2010.  *See* Disp. Mot. 2, Doc. No. 116, at 10-11; Disp. Mot. 3, Doc. No. 152, at 13-14.  *Compare* Harper Cell Log, S.R. Ex. 18, Doc. No. 114-18, at 1 (reflecting Plaintiff assigned to Cell 5 from August 5, 2009, to March 16, 2010), *with* Brown Cell Log, S.R. Ex. 19, Doc. No. 114-19, at 1 (reflecting Mr. Brown assigned to Cell 5 from March 3, 2010 to March 15, 2010). Defendants deny, however, their liability in any such altercation and implicitly contend that Plaintiff has no admissible evidence that either Defendant Thompson or Defendant Brewer placed Mr. Brown in Plaintiff's cell while knowingly disregarding an excessive risk to Plaintiff's health and safety.  *See* Disp. Mot. 2 at 17-18, 35; Disp. Mot. 3 at 13-14,

20; Def. Thompson Aff., S.R. Ex. 5, at 6; Def. Brewer Aff., S.R. Ex. 6, Doc. No. 114-6, at 4.

In response, Plaintiff has presented only his own statement that "the Defendants" told Mr. Brown that Plaintiff "was a snitch . . . to get [Mr. Brown] to attack [Plaintiff]." *See* Pl.'s Resp. to Disp. Mot. 2, Doc. No. 164, at 32; *see also* Pl.'s Resp. to Disp. Mot. 3, Doc. No. 171, at 3-4, 7 (asserting Defendant Brewer told Mr. Brown that Plaintiff "was the one who got the drop spot [b]usted (for drugs)" and referred to Plaintiff as a "snitch"). Plaintiff offers no basis for his personal knowledge as to this allegation. *See* Pl.'s Resp. to Disp. Mot. 2 at 32; Pl.'s Resp.to Disp. Mot. 3 at 3-4, 7; Fed. R. Civ. P. 56(c)(4). Although Plaintiff asserts that Mr. Brown will testify on Plaintiff's behalf, Plaintiff did not submit an affidavit or declaration from Mr. Brown as to what such testimony might contain.[32] *See* Pl.'s Resp. to Disp. Mot. 2 at 32; Pl.'s Resp. to Disp. Mot. 3 at 4; Pl.'s Resp. to Disp. Mot. Exs., Doc. Nos. 165-1 to 165-3. In his own statement, Plaintiff offers only one additional relevant factual allegation beyond the allegations in his Second Amended Complaint: that Mr. Brown was half of Plaintiff's size.[33] *See* Pl.'s Resp. to Disp. Mot. 2 at 13; Pl.'s Resp. to Disp. Mot. 3 at 3.

---

[32] Plaintiff asserts that during a later stay at WCJ in 2012, he and Mr. Brown were both assigned to "E Pod . . . when [Mr. Brown] agreed to testify (he threw a tray of tomato sauce and noodles out the pod beanhole to get moved so Stanley wouldn't punish him before [Plaintiff] got a statement)." Pl.'s Resp. to Disp. Mot. 3 at 4.

[33] Plaintiff also submitted a declaration from an inmate who states that he was in Plaintiff's cell on or about March 15, 2010, but that inmate does not mention Mr. Brown or whether Plaintiff was involved in an altercation in the cell on that date. *See* Melvin Collums Decl., Doc. No. 165-1, at 13.

Not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. As noted, Plaintiff must establish both the objective and subjective component of his claim as to each Defendant implicated. *See id.* at 834-35, 837. Here, the undersigned focuses on the subjective component—i.e., whether Defendants knowingly disregarded an excessive risk to Plaintiff's health and safety. Because Plaintiff has presented insufficient evidence as to his allegation that Defendants assigned Mr. Brown to Plaintiff's cell for the specific purpose of instigating a physical altercation, the undersigned proceeds to consider only whether the remainder of Defendants' alleged conduct establishes the subjective component of Plaintiff's claim. *See Hall*, 935 F.2d at 1111 ("[T]he nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient."); *see also Self v. Crum*, 439 F.3d 1227, 1236 (10th Cir. 2006).

Plaintiff asserts that Mr. Brown was assigned to "Max 7" for "fighting in every cell they put him in." Second Am. Compl. at 11. Mr. Brown's Cell Log, which Plaintiff does not dispute, reflects that Mr. Brown was assigned to Max 7 from February 12 to March 3, 2010. *See* Brown Cell Log at 1; Pl.'s Resp.to Disp. Mot. 2 at 13, 32; Pl.'s Resp. to Disp. Mot. 3 at 3. Plaintiff also asserts that Mr. Brown was "being railroaded and was mad as hell" but does not specifically describe Mr. Brown's behavior in the presence of Defendants Thompson and Brewer either immediately before or during Mr. Brown's placement in Plaintiff's cell. *See* Second Am. Compl. at 11. Thus, although Mr. Brown

may have been placed in Max 7 for "fighting" with other inmates *in the past*, Plaintiff's bare-bones factual allegation that Mr. Brown was "mad as hell" is insufficient to establish that at the time of Mr. Brown's placement in Plaintiff's cell, Defendant Thompson or Defendant Brewer knew of and disregarded an *excessive* risk to Plaintiff's health and safety. That is, an inmate's past unspecified "fighting" and "mad as hell" status—without more—are not sufficient to show that a defendant has ignored an excessive risk to another inmate's health and safety. *See Iqbal*, 556 U.S. at 678-79; *Whitney*, 113 F.3d at 1173-74.

Plaintiff alleges that two altercations occurred between Mr. Brown and him. *See* Second Am. Compl. at 11. As to the first altercation, in which "all [Plaintiff] could do is [lie] on the floor, and hold [Mr. Brown's] wrists, to keep from getting hit," Plaintiff did not initially contend that either Defendant Thompson or Defendant Brewer was present or otherwise could have known about the incident. *See id.* Subsequently, Plaintiff augmented his description to contend that "during both occasions in which Brewer caused/encouraged these altercations," "Brewer laughed at the Plaintiff and cheered [Mr. Brown] on." Pl.'s Resp. to Disp. Mot. 3 at 4. Plaintiff offers no further details or evidence of the circumstances of the first altercation or the alleged conduct by Defendant Brewer.[34] *See id.*

---

[34] Defendant Brewer asserts that he only recalls one physical altercation involving Plaintiff and another inmate—an altercation in which Defendant Brewer contends he promptly intervened. Def. Brewer Aff., S.R. Ex. 6, at 4.

Plaintiff's own sparse statements provide the only evidence that this first altercation occurred. *See* Disp. Mot. 2 at 10-11, 17-18; Disp. Mot. 3 at 13-14, 20; Def. Thompson Aff., S.R. Ex. 5, at 6; Def. Brewer Aff., S.R. Ex. 6, at 4. Even so, these statements indicate that Plaintiff overpowered Mr. Brown, who was purportedly half of Plaintiff's size. Plaintiff offers no indication that he was injured or faced an ongoing threat from Mr. Brown. Even if Defendant Brewer reacted as Plaintiff describes, the evidence does not sufficiently suggest that Defendant Brewer knowingly disregarded an excessive risk to Plaintiff's health and safety by, presumably, failing to intervene or failing to separate the two inmates. Further, as to Defendant Thompson, the evidence does not suggest that she had any awareness whatsoever of this altercation.

As to the second altercation, Plaintiff contends that Defendant Brewer "laughed as [Mr. Brown] got [Plaintiff] in a choke hold" but admits that Defendant Brewer also intervened by opening the cell door, causing Mr. Brown to "fall backwards," after which Plaintiff "landed on [his own] head." *See* Second Am. Compl. at 11. Plaintiff and Mr. Brown were then separated. Pl.'s Resp. to Disp. Mot. 3 at 3, 4. Plaintiff later asserts, without offering any corroborating evidence beyond his own statements, that Defendant Brewer did not intervene until prompted by Defendant Thompson and that Plaintiff had a black eye and bruises from this altercation. *Id.*

Plaintiff's sparse and largely uncorroborated assertions are not sufficient to suggest that either Defendant Brewer or Defendant Thompson knowingly disregarded an excessive risk to Plaintiff's health and safety. *See Anderson*, 477 U.S. at 248-49. For instance, even if Defendant Brewer laughed or delayed in intervening in the prisoners'

altercation, Plaintiff has not presented sufficient facts of the surrounding circumstances to permit a reasonable conclusion that Defendant Brewer's conduct was in knowing disregard of an excessive risk.[35]

Plaintiff has at a minimum failed to establish the subjective component of his above claims and has thus failed to show that a constitutional violation occurred. *See Farmer*, 511 U.S. at 834-35, 837; *Pearson*, 555 U.S. at 232; *Olsen*, 312 F.3d at 1312; *Celotex Corp.*, 477 U.S. at 322. Consequently, the undersigned concludes that Defendants Thompson and Brewer are entitled to qualified immunity as to Plaintiff's claims in Count IX that they exhibited deliberate indifference to his health and safety, and the undersigned recommends that summary judgment be granted accordingly. *See Pearson*, 555 U.S. at 232, 236.

b. Individual-Capacity Claim Against Defendant Stanley

Construing Plaintiff's statements as alleging that Defendant Stanley "directed [that Plaintiff] be placed in a cell with no working toilet," Defendants challenge that claim on its factual veracity. *See* Second Am. Compl. at 16-17; Disp. Mot. 2 at 34-35. Accordingly, the undersigned considers only whether Defendant Stanley in his individual capacity is entitled to summary judgment on this claim. *See* Fed. R. Civ. P. 12(d), 56.

---

[35] Although discovery has been stayed in this matter, Plaintiff has not requested additional discovery or been precluded from obtaining relevant evidence such as sworn statements from other inmates, as he has done in support of other claims. Plaintiff has had adequate time over several years to obtain detailed sworn statements from other witnesses, including Mr. Brown, as to Defendants' conduct alleged above and as to the circumstances surrounding Plaintiff's interactions with Mr. Brown. Instead, Plaintiff has opted to rely solely on his own sworn statements, containing minimal factual details.

Before turning to whether Plaintiff has shown a constitutional violation, the undersigned addresses whether the right at issue was clearly established at the time of Defendant Stanley's alleged misconduct. *See Pearson*, 555 U.S. at 232. As noted, the Eighth Amendment, as interpreted since at least the 1980s, prohibits conditions that are inhumane. *See Farmer*, 511 U.S. at 832 (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)); *Rhodes*, 452 U.S. at 347, 349. In 2001, the Tenth Circuit held that "[w]hile there is no doubt that toilets can be unavailable for some period of time without violating the Eighth Amendment, exposure to human waste carries particular weight in the conditions calculus," further noting that "[e]xposure to human waste, like few other conditions of confinement, evokes both the health concerns emphasized in *Farmer* and the more general standards of dignity embodied in the Eighth Amendment." *DeSpain*, 264 F.3d at 974 (citation and internal quotation marks omitted). Based on this holding and its underlying factual circumstances, the law was clearly established at the relevant time in 2011 that deliberate indifference to an inmate's exposure to human waste due to a nonfunctioning toilet could give rise to an Eighth Amendment violation if sustained for a sufficient duration—in that case, thirty-six hours. *See id.* at 974-75, 979; *Pearson*, 555 U.S. at 232; Pl.'s Resp. to Disp. Mot. 2 at 39-40 (citing *DeSpain*).

Having established that the alleged conduct implicates a clearly established federal right, the undersigned considers whether Plaintiff has shown a violation of the right. *See Pearson*, 555 U.S. at 232. Because Plaintiff asserts that Defendant Stanley acted only by allegedly directing a subordinate employee to place Plaintiff in a particular cell, the undersigned construes Plaintiff's claim against Defendant Stanley as one asserting

supervisor liability. *See* Second Am. Compl. at 17. To that end, Plaintiff must establish that Defendant Stanley's alleged action caused a subordinate employee to violate Plaintiff's federal rights. *See Schneider*, 717 F.3d at 768; *Dodds*, 614 F.3d at 1195-96, 1198; *DeSpain*, 264 F.3d at 971-77. Further, Plaintiff must establish that Defendant Stanley's alleged action was taken with no less than deliberate indifference that a violation of Plaintiff's federal rights would occur. *See Schneider*, 717 F.3d at 769; *Daniels*, 474 U.S. at 330; *Estate of Booker*, 745 F.3d at 435.

Through a sworn statement and through the sworn statements of staff members present at WCJ during the relevant time period, Defendant Stanley denies Plaintiff's allegations to a limited extent. *See* Def. Stanley Aff., S.R. Ex. 11, Doc. No. 114-11; Def. Thompson Aff., S.R. Ex. 10, Doc. No. 114-10; Def. Routh Aff., S.R. Ex. 7, Doc. No. 114-7, at 4-5; Bryan Little Decl., S.R. Ex. 25, Doc. No. 114-25; Jennifer Collison Decl., S.R. Ex. 24, Doc. No. 114-24. In response, Plaintiff reiterates the factual allegations in Count XXI of his Second Amended Complaint, generally disputes the version of events presented by Defendants, and presents additional factual allegations, including that he reported the nonfunctioning toilet to specific WCJ staff members who took no action in response. *See* Pl.'s Resp. to Disp. Mot. 2 at 13-14, 35-38, 41-42.

It is undisputed that Bryan Little, a WCJ detention officer, booked Plaintiff into Cell 1 in E Pod at a newly constructed WCJ on November 23, 2011. *See* Disp. Mot. 2 at 19, Pl.'s Resp. to Disp. Mot. 2 at 13; *see also* Harper Cell Log at 6. Plaintiff defecated in a food tray on November 24, 2011. *See* Second Am. Compl. at 17; Disp. Mot. 2 at 20; Pl.'s Resp. to Disp. Mot 2 at 13, 38. On November 28, 2011, it was observed that the

water to Plaintiff's toilet had been disabled at some unknown point via a mechanism outside the cell, and the water to the toilet was then restored. *See* Disp. Mot. 2 at 21; Pl.'s Resp. to Disp. Mot. 2 at 14, 37. It further appears undisputed that Defendant Stanley was not present at WCJ during these events. *See* Disp. Mot. 2 at 20; Def. Stanley Aff., S.R. Ex. 11, at 3; Pl.'s Resp. to Disp. Mot. 2 at 13-14, 35-38, 41-42.

The following facts are unresolved on the present record: the duration and cause of the toilet's nonfunctioning state; whether Defendant Stanley directed that Plaintiff be placed in a particular cell;[36] whether Defendant Stanley had knowledge of the allegedly nonfunctioning toilet before November 28, 2011; whether Plaintiff reported the condition to any WCJ staff; whether Plaintiff was confined to his cell for the entirety of the referenced period; and whether Plaintiff during that period had access to other toilets.[37] *See* Disp. Mot. at 18-22, 34-35; Pl.'s Resp. to Disp. Mot. 2 at 13-14, 35-38, 41-42. These factual disputes are material to all components of the constitutional violation alleged,

---

[36] Defendants contend in their Reply, without elaboration or argument, that Mr. Little's alleged statement to Plaintiff at the time of booking—that Defendant Stanley had dictated Plaintiff's cell placement—is inadmissible hearsay. *See* Cnty. Defs.' Reply at 4. However, Defendants have not distinguished this statement from, for instance, one that is offered against an opposing party "made by th[at] party's agent or employee on a matter within the scope of the relationship and while it existed" or otherwise supported their contention of inadmissibility. *See* Fed. R. Evid. 801(d)(2)(D).

[37] Neither party addresses in detail what happened in the four days between the tray incident and the water restoration. Further, neither party addresses Plaintiff's initial placement of blame for the allegedly nonfunctioning toilet on Judge Linder without mention of Defendant Stanley or Bryan Little ("the deputy jailer," as Mr. Little was identified in Plaintiff's Second Amended Complaint). *See* Second Am. Compl. Exhibits, Doc. No. 50-1, at 49 (November 28, 2011 letter from Plaintiff to Judge Linder blaming him for nonfunctioning toilet).

including the objective and subjective components of the underlying Eighth Amendment violation alleged, as well as the components necessary to establish supervisor liability.

Even setting aside Plaintiff's generally unsubstantiated speculations as to Defendant Stanley's intent behind his alleged conduct, Plaintiff has put forth some evidence—through his sworn statements, with some corroboration from Defendants—in support of each required component of the constitutional violation alleged. *See Self*, 439 F.3d at 1236; *Hall*, 935 F.2d at 1111. Defendants—generally relying only on their own sworn statements to dispute Plaintiff's allegations—have not overwhelmingly countered Plaintiff's evidence. If Plaintiff had already conducted discovery on this claim and presented only his own sworn statements, and Defendants had presented objective documentation of their version of events, Plaintiff's evidence might be insufficient to withstand summary judgment. *See Hall*, 935 F.2d at 1111. However, viewing the evidence and reasonable inferences in the light most favorable to Plaintiff at this relatively early procedural stage, the undersigned finds that genuine disputes of material fact exist as to each component of this claim against Defendant Stanley in his individual capacity, as discussed above. Accordingly, the undersigned recommends that summary judgment be denied as to this claim. *See DeSpain*, 264 F.3d at 977; *Olsen*, 312 F.3d at 1312. The undersigned further recommends that the case continue to be referred to him for the purpose of overseeing limited discovery as to this claim. *Cf. Mitchell*, 472 U.S. at 526; *Iqbal*, 556 U.S. at 684-86.

*F. Whether Plaintiff Has Stated a Claim of Retaliation (Count XXI)*

In Count XXI, discussed above in Part E.1.b., Plaintiff alleges that Defendant Stanley took the described action in retaliation against Plaintiff for his filing of two civil lawsuits, including this one—i.e., for exercising his constitutional right to access the courts. *See* Second Am. Compl. at 16-17. A prison official is not permitted to retaliate against a prisoner for the prisoner's exercise of constitutional rights. *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998). To state a claim for such retaliation, the prisoner "must allege *specific facts* showing retaliation because of the exercise of the prisoner's constitutional rights." *Id.* (internal quotation marks omitted).

Here, Plaintiff has not presented any specific facts to support his assertion that Defendant Stanley acted in retaliation for Plaintiff's filing of two civil lawsuits. *See* Second Am. Compl. at 16-17. Plaintiff simply speculates that his own action of filing lawsuits prompted Defendant Stanley's allegedly retaliatory conduct against him. *See id.* (suggesting alternative motivations for Defendant Stanley's alleged conduct, neither of which is supported by factual allegations). Thus, Plaintiff has failed to state a claim upon which relief may be granted against Defendant Stanley in his individual capacity for retaliation in Count XXI. *See Iqbal*, 556 U.S. at 678-679. Further, Plaintiff has identified no custom or policy of Woodward County, as would be required, among other things, to establish an official-capacity claim. *See Schneider*, 717 F.3d at 769-70; *Graham*, 473 U.S. at 166. Accordingly, Plaintiff's Second Amended Complaint should be dismissed without prejudice to the extent that a retaliation claim is alleged in Count XXI.

*G. Whether Plaintiff Has Stated a Claim of Denial of Due Process (Count XXI)*

In Count XXI, discussed above in Part E.1.b., Plaintiff notes that after defecating in his food tray at WCJ, he was convicted in a prison disciplinary proceeding of "adulteration of food or drink" and "lost [a number of] days." *See* Second Am. Compl. at 17; *see also* Second Am. Compl. Exs., Doc. No. 50-1, at 1-6, 12-13 (presenting records from prison disciplinary proceeding at Lawton Correctional Facility in Lawton, Oklahoma). Plaintiff suggests that he disagrees with this conviction, asserting that "there was no food or drink in the tray." *See* Second Am. Compl. at 17. Defendant Stanley, against whom the factual allegations in Count XXI are levied, is not implicated in Plaintiff's records related to that disciplinary proceeding. *See id.* at 1-13.

Nevertheless, to the extent that Plaintiff is alleging that he is entitled to damages or declaratory relief for a violation of his procedural due process rights based on the noted conviction that resulted in "lost . . . days," the undersigned finds that Plaintiff has presented no factual allegations to connect any Defendant to a due process violation during the challenged disciplinary proceeding, which occurred at a facility other than WCJ. *See* Second Am. Compl. at 16-17; Second Am. Compl. Exs. at 1-13; *Pahls*, 718 F.3d at 1226, 1228. Accordingly, to the extent such a claim is alleged, it should be dismissed without prejudice for failure to state a claim upon which relief may be granted.[38] *See* 42 U.S.C. § 1997e(c)(1); 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b); *Mendia*

---

[38] On September 15, 2014, Plaintiff filed a motion to amend his response to Defendants' dispositive motions to include evidence that the charge in the challenged disciplinary

*v. City of Wellington*, 432 F. App'x 796, 797 n.1 (10th Cir. 2011) (citing *Hafed v. Fed. Bur. of Prisons*, 635 F.3d 1172, 1178 (10th Cir. 2011)).

### H. Whether Plaintiff Has Stated a Claim of Denial of Access to the Courts (XX)

In Count XX of his Second Amended Complaint, Plaintiff alleges that Defendants Stanley and Thompson violated his right to access the courts by "refus[ing] to answer or return any request to staff dealing with [his] back injury," despite his submission of "numerous" requests.[39]   Second Am. Compl. at 16.   Plaintiff's bare assertion that Defendants Thompson and Stanley violated Plaintiff's right to access the courts by allegedly failing to respond to his requests to staff appears to be directed to the

proceeding was dismissed in May 2014.  *See* Pl.'s Mot. to Am. Resp., Doc. No. 214; Pl.'s Mot. to Am. Resp. Ex., Doc. No. 214-1.  The undersigned has granted Plaintiff's motion and has considered the information presented therein.  Nevertheless, as noted, Plaintiff's Second Amended Complaint does not state facts to sufficiently connect any Defendant with any alleged due process violation at a separate facility.  The information presented in Plaintiff's motion does not alter this conclusion.

[39] Plaintiff also makes the conclusory assertion that this conduct violated his Fourteenth Amendment rights to due process and equal protection.  The factual insufficiencies of Plaintiff's various equal protection claims are addressed together in a separate section below.  As to a due process claim, Plaintiff's minimal factual assertions in Count XX do not support any reasonable inference that Plaintiff has been deprived of a protected liberty or property interest without due process of law.  In any event, to the extent that Plaintiff asserts that a failure of the WCJ grievance process itself constituted a denial of a liberty interest, the Tenth Circuit has held, in unpublished decisions cited here for their persuasive value, that "there is no independent constitutional right to state administrative grievance procedures.  Nor does the state's voluntary provision of an administrative grievance process create a liberty interest in that process."  *Boyd v. Werholtz*, 443 F. App'x 331, 332 & n.1 (10th Cir. 2011) (citation omitted) (affirming dismissal for failure to state a claim upon which relief may be granted when prisoner plaintiff alleged deprivation of prison grievance process); *see also Spry v. McKune*, 479 F. App'x 180, 181 (10th Cir. 2012) (same).  Thus, because Plaintiff could not establish a protected liberty interest for such a procedural due process claim, the undersigned construes Plaintiff's claim in Count XX strictly as an access to the courts claim.

requirement that Plaintiff exhaust his administrative remedies before seeking relief in court regarding medical care for his back injury. *See* 42 U.S.C. § 1997e(a). Defendants have not, however, argued that Plaintiff failed to exhaust his administrative remedies.

Regardless, Plaintiff's claims alleging deliberate indifference to his back injury are now before the Court; thus, Plaintiff was not prevented from pursuing such claims. Moreover, if a prisoner's underlying administrative grievance involves a federal right, the issue may be addressed by seeking relief from the exhaustion requirement in the particular case in which the prisoner asserts a violation of the federal right. *Boyd v. Werholtz*, 443 F. App'x 331, 332 (10th Cir. 2011) (citing *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991)); *see also Little v. Jones*, 607 F.3d 1245, 1250 (10th Cir. 2010). Plaintiff has not sought or been denied such relief.

Prisoners have a "fundamental constitutional right of access to the courts." *See Bounds v. Smith*, 430 U.S. 817, 828 (1977). *But cf. Lewis v. Casey*, 518 U.S. 343, 350-51 (1996) (emphasizing that right can be satisfied in variety of forms and does not impose specific requirements on prisons). To state a claim that one's right to court access has been violated, a plaintiff must first allege facts to establish a nonfrivolous underlying cause of action that he or she was prevented from pursuing based on the defendant's actions. *Christopher v. Harbury*, 536 U.S. 403, 415 (2002); *see also Lewis*, 518 U.S. at 351-52 (describing right as "meaningful access to the courts" with deprivation established through actual injury). Here, Plaintiff has not alleged facts that would permit a reasonable inference that Defendant Stanley's or Defendant Thompson's alleged refusal to respond to his requests prevented Plaintiff from pursuing a nonfrivolous cause of

action.  *See Christopher*, 536 U.S. at 415; *Lewis*, 518 U.S. at 351-52.  Further, Plaintiff has identified no custom or policy of Woodward County on this matter, as would be required, among other things, to establish an official-capacity claim.  *See Schneider*, 717 F.3d at 769-70; *Graham*, 473 U.S. at 166.  Accordingly, Plaintiff's claims that Defendants Stanley and Thompson violated his right to access the courts should be dismissed without prejudice.[40]  *See Iqbal*, 556 U.S. at 678-79.

I.  *Whether Plaintiff Has Stated a Claim of Denial of Equal Protection Under the Law (Counts I, V, IX, XX, XXI)*

Plaintiff has alleged a violation of his Fourteenth Amendment right to equal protection in each of the Counts addressed above.  *See* Second Am. Compl. at 7, 8, 9-10, 11, 16-17.  The undersigned now addresses the sufficiency of such claims in Counts I, V, IX, XX, and XXI, but abstains from addressing Count VII based on the recommendation below that certain claims in that Count be stayed.

In Count I, which is specifically directed against the Board, Plaintiff asserts that the Board has established policies for the Sheriff's Department and WCJ that promote "the harassment of convicted felons (the poor), and the denial of medical care and equal

---

[40] Plaintiff also asserted a violation of a right to access the courts in Count XXI.  The undersigned has, however, construed that claim as alleging retaliation and has addressed the claim in a separate section above.  If such assertion were construed as a claim for denial of access to the courts, that claim would be subject to dismissal for the same reasons as set forth above regarding Count XX.

protection of the law, for persons not born in Woodward County."[41]  *Id.* at 7.  In support

of this assertion, Plaintiff alleges that the following circumstances have affected him

since he moved to Oklahoma in 1987:

> If I defend myself[,] I get a felony conviction[.]  [P]eople with histories of
> vehicular assault are allowed to ram my vehicle, as I drive down the road.
> People are allowed to steal my property, and no charges get filed.  If I get
> physically attacked and do nothing, I get arrested for it.

Second Am. Compl. at 7.

The Fourteenth Amendment's Equal Protection Clause generally requires like

treatment among similarly situated persons.  *City of Cleburne v. Cleburne Living Ctr.*,

473 U.S. 432, 439 (1985).  The Fourteenth Amendment also limits a state's ability to

burden a fundamental right or to target a suspect class.  *See Romer v. Evans*, 517 U.S.

620, 631 (1996).

In Counts I, V, IX, XX, and XXI, Plaintiff describes only his own circumstances.

Plaintiff does not identify any similarly situated persons to bolster his broad allegations

that Defendants have acted against him, e.g., through a denial of medical care, *because* he

is a convicted felon or poor or *because* he was not born in Woodward County.  Plaintiff's

allegations do not suggest that Defendants' actions impermissibly burdened a

fundamental interest or targeted a suspect class.  Nor does Plaintiff allege that he is a

member of a suspect class.  Further, Plaintiff does not sufficiently identify or describe

---

[41] To the extent that Plaintiff is asserting a violation of his right as a prisoner to be free
from deliberate indifference to his serious medical needs, the undersigned has addressed
such a claim above in Part D.3.b.

any official policy, as would be required, among other things, to establish municipal liability for any official-capacity claim. *See Schneider*, 717 F.3d at 769-70; *Graham*, 473 U.S. at 166.

Thus, Plaintiff has not alleged sufficient facts in Counts I, V, IX, XX, or XXI to state a claim upon which relief may be granted against Defendants Stanley, Thompson, Brewer, or the Board for a violation of his right to equal protection under the Fourteenth Amendment. Such claims should be dismissed without prejudice. *See Iqbal*, 556 U.S. at 678-79.

*J. Whether Plaintiff's Claims of Excessive Force and Failure to Intervene (Count VII) Should Be Stayed*

In Count VII of his Second Amended Complaint, Plaintiff alleges that Defendants Brewer and Routh violated Plaintiff's Fourteenth Amendment rights to due process and equal protection during a physical altercation that occurred at Urgent Care on March 16, 2010, and for which Plaintiff presents his version of events. *See* Second Am. Compl. at 9-10. Criminal charges stemming from this physical altercation are pending against Plaintiff in the District Court of Woodward County, Oklahoma. More specifically, Plaintiff has been charged with assault and battery on a police officer, as well as disturbing the peace. *See State v. Harper*, No. CF-2010-100 (Woodward Cnty. Dist. Ct.

filed Mar. 23, 2010); *see also* Second Am. Compl. Exs., Doc. No. 50-1, at 31-33 (copy of probable cause affidavit for arrest without warrant filed in No. CF-2010-100).[42]

As noted above, the abstention doctrine set forth in *Younger v. Harris*, 401 U.S. 37, provides that federal courts should avoid interfering in ongoing state judicial proceedings when the state court "offer[s] an adequate forum to hear the federal plaintiff's claims from the federal lawsuit" and the state proceeding "involve[s] important state interests." *Taylor v. Jaquez*, 126 F.3d 1294, 1297 (10th Cir. 1997) (discussing *Younger*); *see also Middlesex Cnty. Ethics Comm.*, 457 U.S. at 431 (noting that under *Younger*, federal courts avoid "interference with pending state judicial proceedings absent extraordinary circumstances"). This abstention doctrine applies "whenever the requested relief would interfere with the state court's ability to conduct proceedings, regardless of whether the relief targets the conduct of a proceeding directly." *See Joseph A. ex rel. Wolfe v. Ingram*, 275 F.3d 1253, 1272 (10th Cir. 2002).

Because Plaintiff's pending state criminal charges arise from the same circumstances described in Count VII of his Second Amended Complaint, a dispositive finding as to his claims of excessive force and failure to intervene could interfere with the state court's ability to conduct proceedings as to Plaintiff's guilt or innocence of the criminal charges. The state court offers an adequate forum for Plaintiff to present his federal claims alleging constitutional violations, and the State of Oklahoma has an

---

[42] The docket sheet for No. CF-2010-100 is publicly available at
http://www1.odcr.com/detail?court=077-&casekey=077-CF++1000100.

important interest in resolving whether, for instance, one of its citizens has committed assault and battery against another. Thus, the undersigned recommends that the Court stay the claims in Count VII—with the exception of any claim that Defendant Brewer exhibited deliberate indifference to Plaintiff's serious medical needs, which should be dismissed as discussed above in Part D.3—until resolution of the pending criminal matter in state court.[43] The undersigned further recommends that Defendant Brewer's and Defendant Routh's dispositive motions as to Count VII be denied without prejudice to subsequent reurging if the stay is lifted.

RECOMMENDATION

In sum, based on the foregoing analysis, the undersigned recommends:

1. That Defendant Woodward County Board of County Commissioner's Dispositive Motion (Doc. No. 115) be denied in part and granted in part as follows:

---

[43] In his Second Amended Complaint, Plaintiff also references a separate state court criminal proceeding, *State v. Harper*, No. CF-1999-301 (Woodward Cnty. Dist. Ct. filed Nov. 23, 1999), in which a portion of a suspended sentence was revoked and Plaintiff was ordered to serve seven years in ODOC custody. *See, e.g.*, Second Am. Compl. at 14, 19. The docket sheet for No. CF-1999-301 is publicly available at http://www1.odcr.com/detail?court=077-&casekey=077-CF++9900301. This revocation occurred on March 29, 2010—i.e., contemporaneously with the filing of No. CF-2010-100, which, as noted, implicates the same factual circumstances presented in Count VII discussed above. A review of publicly available ODOC records reflects that Plaintiff is currently in ODOC's custody as a result of that sentence revocation. To the extent that Plaintiff is challenging his current detention, however, he has not established that such challenge is properly before this Court. E.g., he has not provided evidence of having exhausted state remedies as required. *See Preiser v. Rodriguez*, 411 U.S. 475, 489-90 (1973).

a. To the extent Defendant Board seeks dismissal because it is not a proper party to this lawsuit, the Motion should be denied.

b. To the extent Defendant Board seeks dismissal of active official-capacity claims against it, the Motion should be granted.[44]

2. That Defendant Stanley, Thompson, and Routh's Dispositive Motion (Doc. No. 116) be granted in part and denied in part as follows:

a. Defendant Stanley[45]

    i. To the extent Defendant Stanley seeks dismissal of any active individual-capacity or official-capacity claims for deliberate indifference to a serious medical need, for retaliation, for a violation of Plaintiff's right to access the courts, or for a violation of his right to equal protection, Defendants' Motion should be granted.

    ii. To the extent Defendant Stanley seeks dismissal of any active official-capacity claim for deliberate indifference to inmate health and safety, Defendants' Motion should be granted.

    iii. To the extent Defendant Stanley seeks summary judgment on any active individual-capacity claim for deliberate indifference to inmate health and safety, Defendants' Motion should be denied without prejudice.

b. Defendant Thompson

    i. To the extent Defendant Thompson seeks dismissal of any official-capacity claims for deliberate indifference to a serious medical need or to inmate health and safety, Defendants' Motion should be granted.

    ii. To the extent Defendant Thompson seeks summary judgment on any individual-capacity claims for deliberate indifference to a serious medical need, Defendants' Motion should be denied without prejudice.

---

[44] The undersigned makes no recommendation as to any stayed official-capacity claims against Defendant Board. *See* Order, Doc. No. 73, at 3.

[45] The undersigned makes no recommendation as to any stayed claims against Defendant Stanley. *See* Order, Doc. No. 73, at 3.

        iii. To the extent Defendant Thompson seeks summary judgment on any individual-capacity claims for deliberate indifference to inmate health and safety, Defendants' Motion should be granted.

        iv. To the extent Defendant Thompson seeks dismissal of any claim that she violated Plaintiff's right to access the courts or right to equal protection, Defendants' Motion should be granted.

   c. Defendant Routh

        i. To the extent Defendant Routh seeks a dispositive ruling on the failure to intervene claim described in Count VII of Plaintiff's Second Amended Complaint, Defendants' Motion should be denied without prejudice and the claim should be stayed in accordance with *Younger* abstention.

3. That Defendant Brewer's Dispositive Motion (Doc. No. 152) be granted in part and denied in part as follows:

   a. To the extent Defendant Brewer seeks dismissal of any individual-capacity or official-capacity claim for an equal protection violation— aside from any such violation alleged in Count VII—Defendant's Motion should be granted.

   b. To the extent Defendant Brewer seeks dismissal of any official-capacity claims for deliberate indifference to inmate health and safety, Defendant's Motion should be granted.

   c. To the extent Defendant Brewer seeks summary judgment on any individual-capacity claims for deliberate indifference to inmate health and safety, Defendant's Motion should be granted.

   d. To the extent Defendant Brewer seeks any dispositive ruling on the excessive force claim described in Count VII of Plaintiff's Second Amended Complaint, Defendant's Motion should be denied without prejudice and the claim should be stayed in accordance with *Younger* abstention.

4. The undersigned further recommends that the following claims in Plaintiff's Second Amended Complaint be dismissed without prejudice in accordance with the Court's screening authority:

   a. Any individual-capacity claims against the members of Defendant Board of County Commissioners;

    b. Any individual-capacity or official-capacity claim against Defendant Brewer for deliberate indifference to a serious medical need; and

    c. Any individual-capacity claims against any Defendant for a due process violation in connection with a prison disciplinary proceeding at Lawton Correctional Facility.

5. Finally, the undersigned recommends that this case continue to be referred to the undersigned for the purpose of overseeing limited discovery as to active claims not otherwise disposed of in this Report and Recommendation.[46]

NOTICE OF RIGHT TO OBJECT

The parties are advised of the right to file an objection to this Report and Recommendation with the Clerk of this Court by October 17, 2014, in accordance with 28 U.S.C. § 636 and Federal Rule of Civil Procedure 72. The parties are further advised that failure to timely object to this Report and Recommendation waives the right to appellate review of both factual and legal issues contained herein. *See Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

---

[46] If this Report and Recommendation is adopted, Plaintiff's remaining claims will be: (1) claims that have been stayed that relate to Plaintiff's June 2009 arrest; (2) claims related to excessive force, failure to intervene, and equal protection in Count VII against Defendants Routh and Brewer, which will also be stayed; (3) an individual-capacity claim in Count V against Defendant Thompson for deliberate indifference to a serious medical need; and (4) an individual-capacity claim in Count XXI against Defendant Stanley for deliberate indifference to inmate health and safety. Only the latter two claims would be active unless and until the stay is lifted.

This Report and Recommendation does not terminate the referral in the present case.

ENTERED this 26th day of September, 2014.

_Charles B. Goodwin_
CHARLES B. GOODWIN
UNITED STATES MAGISTRATE JUDGE